# United States Court of Appeals
## For the First Circuit

No. 04-1310

NIQUICIA WILSON,

Plaintiff, Appellant,

v.

CITY OF BOSTON; CAPTAIN ROBERT DUNFORD,

Defendants, Appellees,

OFFICER JANINE MITCHELL; PAUL EVANS, in his capacity as
Commissioner of the Boston Police Department; UNKNOWN SERGEANT
BADGE NUMBER 958; JOHN DOE; JOHN POE,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

---

Before
Lipez, Circuit Judge,
Stahl, Senior Circuit Judge,
and Oberdorfer, Senior District Judge.[*]

---

Andrew M. Fischer, with whom Jason & Fischer was on brief, for
appellant.
Amy E. Ambarik, Assistant Corporation Counsel, with whom
Stephen G. Cox, Assistant Corporation Counsel, and Merita A.
Hopkins, Corporation Counsel, were on brief, for appellees.

---

August 31, 2005

---

[*]    Of the District of the District of Columbia, sitting by
designation.

**LIPEZ, Circuit Judge**.  This appeal stems from a mass arrest sting designed to capture a large number of persons with outstanding arrest warrants.  Plaintiff-appellant Niquicia Wilson, who had no criminal record and was never subject to an arrest warrant, was mistakenly swept up in the arrest.  As a result of this experience, she sued various arresting officers and the City of Boston under 42 U.S.C. § 1983 and state law.  The district court granted summary judgment to the City, but the rest of the case went to trial.  Wilson prevailed at trial against Captain Robert Dunford, who planned and commanded the operation and was the arresting officer.  However, the court granted judgment notwithstanding the verdict for Dunford on the basis of qualified immunity.  That ruling is the principal subject of this appeal.

We hold that the jury was entitled to conclude that Wilson's arrest was an unreasonable seizure prohibited by the Fourth Amendment.  Nevertheless, we find that Dunford was entitled to qualified immunity because an objectively reasonable officer in his position could have believed that his conduct would not violate the Fourth Amendment.  We also agree with the district court's resolution of other issues presented on appeal.  Consequently, we affirm.

## I.

Because the case was tried to a jury, we recite the facts in the light most favorable to the verdict. <u>United States</u> v. <u>Castellini</u>, 392 F.3d 35, 39 (1st Cir. 2004).

## A.

In the spring of 1999, plaintiff-appellant Niquicia Wilson, an eighteen-year-old student with no criminal history, and her boyfriend, Jean Cassamajor, received a letter in the mail. The letter, addressed to Cassamajor, came from John Goodwin, who supposedly represented a company called Madrid International that was planning to act as a job broker to hire a large number of people for work on Boston's "Big Dig" construction project. The letter invited Cassamajor to attend a job fair on Sunday, June 27, 1999 at the Bayside Expo Center in Dorchester, Massachusetts. Wilson was excited by the prospect of stable, long-term employment for Cassamajor, and encouraged him to attend.

On the day of the job fair, Wilson drove Cassamajor to the Bayside Expo Center, parked the car, and accompanied him into the lobby of the exhibition hall. Cassamajor went to check in at a staffed registration table, and Wilson went to a nearby vending machine to buy a soda.

Suddenly she heard a commotion, and saw that two or more men had tackled Cassamajor and thrown him to the floor. One of the men yelled to Cassamajor that he was under arrest, and Wilson

inferred (correctly) that the men were plain-clothed police officers. The officers pushed Cassamajor through a set of double doors into the exhibition hall.

Wilson approached the officers and asked what was happening. They instructed her to go into the exhibition hall, and "nudged" or encouraged her in the direction of the doors. Not wanting to receive the same treatment as Cassamajor, Wilson complied and entered the hall. There were approximately 105 people seated in the hall, and a larger number of police officers. Wilson saw that Cassamajor (now handcuffed) was sitting near the front, and she sat down behind him.

Defendant-appellee Captain Robert Dunford of the Boston Police Department ("BPD") was standing at a podium in the front of the room.[1] He told the assembled group that they were all under arrest and that everyone should sit calmly. Not everyone complied -- some of those present yelled at the officers -- but Wilson sat calmly. At some point Dunford and other police officers explained that everyone in the room was under arrest for outstanding warrants, and Wilson realized that the "job fair" was in fact a sting operation. Someone shouted a question regarding what would happen to arrestees who did not actually have a warrant

---

[1]Dunford is currently the Superintendent of the BPD. We refer to him as Captain Dunford because that was his position during the events at issue in this case.

outstanding.  Captain Dunford responded that if the person did not have a warrant, the police "would square that away later."

Wilson informed a nearby officer that she was only at the hall to drop her boyfriend off, and that if he checked he would see that there was no warrant for her arrest.  The officer told her to sit down.  Another arrestee had also told officers that he was in the hall by mistake, and a Detective Arnstein summoned Captain Dunford to talk to that person and Wilson.  After Wilson explained her situation to Dunford, he replied "fine, we are just going to check you to make sure that the story you are telling us is the truth and if that is determined, you are free to leave."

At police instructions, Wilson remained seated for "a very long time."[2]  She did not speak up at this point because, she later explained, "I didn't want to get roughed up.  Some people were being roughed up.  I didn't want that to happen to me."

The police took arrestees in groups to a table at the back of the hall for processing.  When Wilson's section was finally

---

[2]Wilson's characterizations of the intervals of time at issue are very approximate.  At various times her testimony provides a range of time (e.g., "[a]bout ten, 15 minutes"); in such instances we state the higher end of the range.  For the first eight minutes after Captain Dunford announced that everyone in the room was under arrest, a videotape of the sting provides some time references, but much of Wilson's testimony cannot be precisely matched to events shown on the videotape.  Because we recite the facts in the light most favorable to the jury's verdict for Wilson, see Castellini, 392 F.3d at 39, we generally rely on her depiction of the events that she witnessed, eschewing specificity where the record viewed in this light does not provide it.

called -- it was the last section -- she was handcuffed and moved towards the processing table. All along the way, she repeatedly insisted that she had no warrants.

At the processing table, Detective Janine Mitchell (a defendant below, but not before us on appeal) was matching arrestees to folders compiled in advance. Upon realizing that there was no folder for Wilson, Mitchell inquired if she had any aliases, such as "Nicky," "Tonya," or "Nicole." Wilson stated that she did not. Eventually, after about fifteen minutes, Mitchell led Wilson outside the building to stand near a van with a computerized warrant checking system. Wilson asked to be taken inside due to the heat, but Mitchell said words to the effect of, "We know you're lying and until you tell us the truth, you'll sit out here."

The officer inside the van asked Wilson for identification, and she produced a valid Massachusetts driver's license. The officer continued to check for outstanding warrants under names such as "Nicky Wilson" or "Tonya Wilson." After about half an hour, having concluded that there was in fact no warrant for Wilson's arrest, the officers sent for Captain Dunford.

When Dunford arrived, he asked Wilson for identification, and she again produced her driver's license. Finally, realizing the error, he explained that she would be released as soon as the police could fill out an "incident report." In the meantime, she was moved back into the auditorium. It took the officers another

ten minutes to write the incident report, which was noted as completed at 11:30 AM and which stated in relevant part: "Suspect above was placed under arrest as a result of Operation Madrid . . . . Subsequent warrant check revealed suspect to have no outstanding warrants."[3]  It took another twenty minutes to await a "cuff cutter" who could cut off her plastic handcuffs.

After her handcuffs were cut, Wilson was free to leave. The entire incident had taken a little under two hours.  She went to the parking lot and found her boyfriend Cassamajor, who, it turned out, did not have an outstanding warrant either.[4]

**B.**

The "job fair" had been about three months in the making. The BPD had a longstanding problem with outstanding arrest warrants (due in part to erroneous names, addresses, and so forth), and by early 1999 there were some 14,000 warrants outstanding.  Captain Dunford conceived a plan, code named  "Operation Goodwin," to help solve the problem by luring suspects to a fictitious job fair and then arresting them en masse.

The BPD mailed a letter with a job application to the targets of the 14,000 outstanding warrants.  About 6,500 of those letters were returned for having bad addresses.  In other cases,

---

[3]Wilson asked for a copy of the incident report, but the officers refused.  She eventually obtained it through counsel.

[4]The record does not indicate whether Cassamajor filed suit.

the BPD learned that the suspect had died or left the jurisdiction.

The BPD took other measures to whittle the list. In some cases, the suspect was arrested on another matter and therefore no longer needed to be part of Operation Goodwin. In other cases, the BPD determined that the warrant had been cleared in court (e.g., a fine had been paid) and the department's computerized warrant system was simply not up to date. After all the fine-tuning, the list was narrowed to some 300 persons. The BPD sent them a second letter with an invitation to a June 27, 1999 job fair at the Bayside Expo Center and requested an RSVP. Of those 300, 192 responded. One of the 192 was Wilson's boyfriend Cassamajor, who had once been the subject of an arrest warrant which, apparently unbeknownst to the BPD, had already been cleared.

The plan for the event called for civilian BPD employees to staff registration tables at the hall entrance. These employees would verify that each arriving person was on the list of the 200 persons who had indicated that they planned to attend the event. Captain Dunford anticipated that some of the recipients might bring family members or friends, or that random passers-by might wander in. If an uninvited person presented himself at the registration table, he would be told that the event was invitation-only and a similar event would be held in a few weeks. The registration table was the only point at which entrants were checked to ensure that they were actually invited.

Once a "job fair" attendee was verified at the registration table, he would be directed to alphabetically organized seats. Plainclothed police "spotters" would be interspersed among the attendees in case anyone had a weapon. At 10:00 AM, Captain Dunford would ascend the podium and announce that everyone was under arrest. Police arrest teams would then enter and secure the room. Arrestees would be taken by rows to a processing table at the rear of the hall, where officers would have alphabetically organized folders containing each arrestee's photograph, outstanding warrants, and a pre-filled arrest report.

According to Dunford, the plan provided that the processing table would be the point at which the BPD would deal with arrestees who claimed that they did not have a warrant.[5] The plan was that "[s]ince [the BPD] had folders on every person who was supposed to be there with their photo . . . if anyone did get into the hall by mistake, we could clarify it right there." For example, if an arrestee presented documentation stating that the warrant had been cleared (e.g., a receipt from the court stating that a fine had been paid), he would be released. Alternatively, if it turned out that an arrestee simply had the misfortune of sharing a name with someone who actually had an outstanding warrant, the officers at the processing table would realize that

_____

[5]This was apparently the meaning of his remark that if a arrestee had no warrant, the police "would square that away later."

the photograph did not match, and would "be able to immediately look at the photo and say these are two different people and release that person immediately."

On the morning of the event, two hours before it was to begin, the BPD rechecked all 200 names on the list to ensure that no one had been arrested, or had his warrant cleared, since the invitations had been mailed.  To maintain the element of surprise, the approximately 100 line officers involved were not informed of the operation until just beforehand.[6]

At the convention center, approximately 105 of the 200 responding invitees appeared and registered.  Captain Dunford made the planned arrest announcement a few minutes after 10:00 AM.  He was shortly thereafter told that there were two people (not including Wilson) who were in the hall by mistake.  Dunford called them out by name, apologized, and personally escorted them to the front reception area.  Civilian employees then verified their identification and released them.

Of the 105 attendees, the vast majority indeed had valid outstanding warrants.  Operation Goodwin was essentially complete

---

[6]The record contains information, ultimately not presented at trial, suggesting that the briefing was incomplete in comparison to Captain Dunford's plan.  For example, the officers at the processing table were not instructed on what to do in case an arrestee claimed she was present by mistake.

by noon, several hours ahead of schedule. That afternoon, the BPD held a press conference to announce the operation, at which Captain Dunford spoke and described the sting as a success.

## II.

Wilson filed suit in Massachusetts Superior Court against Captain Dunford, Officer Mitchell, three unknown police officers ("the police defendants"), the City of Boston, and the Commissioner of the BPD ("the municipal defendants"). Against the police defendants, she pled false imprisonment (Count I), intentional infliction of emotional distress (Count II), and violations of various constitutional rights (principally, the right to be free from unreasonable seizure under the Fourth Amendment) under 42 U.S.C. § 1983 and the parallel Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11H (Count III). Against the municipal defendants, she pled negligent supervision (Count IV) and a policy or custom of failing to reasonably train and supervise police officers (Count V). The defendants removed the suit to federal court.

The district court ruled from the bench on cross-motions for summary judgment. It granted the City's motion for summary judgment on the grounds that Wilson had failed to establish either that the City had negligently supervised its officers, or that Captain Dunford -- who had conceived and led Operation Goodwin -- was an official policymaker within the meaning of <u>Monell</u> v.

Department of Social Services, 436 U.S. 658, 694 (1978). The court denied the motions of Dunford and Mitchell -- who had argued both that Wilson's rights were not violated and that they were entitled to qualified immunity -- on the grounds that "there are factual issues that need to be presented at trial that preclude[] summary judgment in either direction." For the same reason, it denied Wilson's motion for summary judgment.

The claims against Dunford and Mitchell proceeded to a jury trial. At the close of all the evidence, the district court granted the police defendants' motions for judgment as a matter of law on the claim of intentional infliction of emotional distress (Count II). Thus, only three claims remained: false imprisonment (Count I), violation of civil rights under 42 U.S.C. § 1983 (Count III), and violation of civil rights under the Massachusetts Civil Rights Act (also pled as part of Count III). Over both parties' objections, the district court submitted the question of qualified immunity to the jury on a special verdict form.

The jury returned a verdict for Mitchell on both counts. As to Dunford, the jury found no false imprisonment or violation of the Massachusetts Civil Rights Act. However, it found that he had violated Wilson's Fourth Amendment right to be free from unreasonable seizure, and that he was not entitled to qualified immunity under § 1983. It awarded nominal damages of one dollar.

Both parties moved for judgment as a matter of law under Fed. R. Civ. P. 50. The district court granted Dunford's motion, concluding both that Wilson's detention did not violate the Fourth Amendment and that Dunford was entitled to qualified immunity as a matter of law. The court also acknowledged that it had erred in initially submitting the qualified immunity question to the jury. It thus entered judgment as a matter of law for Dunford. This appeal followed.

## III.

On appeal, Wilson assigns, by our count, six distinct errors below.[7] Three have been procedurally forfeited and we dispose of them summarily.[8] The claims that remain are that (1)

---

[7]We construe her assignments of error generously and ignore certain defects in her argument. For example, much of her argument concerning the Fourth Amendment issue lies in a section devoted to challenging the district court's refusal to grant summary judgment in her favor. Strictly speaking, we have no jurisdiction over such a claim because denial of summary judgment is not appealable under 28 U.S.C. § 1291. See Nieves-Luciano v. Hernandez-Torres, 397 F.3d 1, 4 (1st Cir. 2005). However, since she properly preserved these issues by moving for judgment as a matter of law at the close of all the evidence and then again after the jury verdict, and since there is no prejudice to defendants, we treat this argumentation as if it were aimed at the district court's denial of her motion for judgment as a matter of law, which we have jurisdiction to review.

[8]First, Wilson argues that the court failed to give a jury instruction that false arrest constitutes "coercion" under the Massachusetts Civil Rights Act. This claim was not preserved because her request for this instruction below was inadequate and untimely, and she did not timely object to the instruction as given. See Fed. R. Civ. P. 51(c); Gray v. Genlyte Group, Inc., 289 F.3d 128, 133-34 (1st Cir. 2002). Consequently, we review for plain error. Id. at 134. Even if the failure to give this instruction was an error that is plain and would likely affect the

-13-

the evidence established a Fourth Amendment violation, (2) Dunford is not entitled to qualified immunity, and (3) the City is liable under Monell because Dunford was a policymaker.

We begin with some observations about our standard of review.  The posture of this case is somewhat unusual.  Typically, a § 1983 defendant raises the qualified immunity issue either in a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or a motion for summary judgment under Fed. R. Civ. P. 56.  See Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004) (noting that "applicability vel non of the qualified immunity doctrine should be determined at the earliest practicable stage in the case"); see also Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (value of defense "is effectively lost if a case is erroneously permitted to go to trial").  If the district court grants one of these dispositive motions, then the plaintiff appeals.  If the court denies the motion on legal grounds, the defendant usually takes an interlocutory appeal.  See

outcome, it would not be "sufficiently fundamental to threaten the fairness or integrity or public reputation of the judicial proceeding."  Id. (internal quotation marks omitted).

Second, she argues that the jury returned an inconsistent verdict because it found a violation of § 1983 but not of the Massachusetts Civil Rights Act.  She forfeited this argument by failing to object before the jury was discharged, Howard v. Antilla, 294 F.3d 244, 250 (1st Cir. 2002), and once again it does not qualify as plain error.

Third, she argues that the court erred by denying her motion for judgment as a matter of law on the false imprisonment claim. The point is inadequately developed, even when we combine it with her argument for reversal of the district court's denial of summary judgment, see supra note 7, and we deem it waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-14-

Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 60 (1st Cir. 2004);

see also Saucier v. Katz, 533 U.S. 194, 200 (2001) (explaining that

the purpose of qualified immunity is not just to protect the

defendant from liability, but also from "stand[ing] trial or

fac[ing] the other burdens of litigation") (quotation marks

omitted).[9]  In either case, the same analytic framework applies:

> This Court has identified a three-step process for evaluating qualified immunity claims: (1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001).

In Saucier, the Supreme Court explained that the pure

constitutional question (i.e., the first prong) "must be the

initial inquiry," and courts may not simply "skip ahead to the

question whether the law clearly established that the officer's

conduct was unlawful in the circumstances of the case."  533 U.S.

at 201.  Saucier explained that courts must address the

constitutional merits question first in order to facilitate the

development of the law:

---

[9]Here, the defendants probably could not have taken an interlocutory appeal because summary judgment was denied based on factual disputes, not legal questions.  See Rodríguez-Rodríguez v. Ortiz-Vélez, 391 F.3d 36, 39-40 (1st Cir. 2004).

> In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry.

Id.

Here, the district court rejected the police defendants' motions for summary judgment on the basis of qualified immunity, and the entire case -- including not only whether Wilson suffered a Fourth Amendment violation, but also whether the police defendants enjoyed qualified immunity for any such violation -- was tried to the jury. After the jury returned a verdict and Dunford moved for judgment as a matter of law, the district court later recognized that the qualified immunity issue was a question of law for the court to decide, notwithstanding any disputed material facts. See Suboh v. Dist. Attorney's Office, 298 F.3d 81, 90 (1st Cir. 2002); St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995) ("The ultimate question of qualified immunity should

ordinarily be decided by the court."); id. at 24 n.1.[10]  The court

concluded that Dunford was entitled to qualified immunity.

This atypical history means that we are in the somewhat

unusual position of considering the qualified immunity question for

the first time when the case has already been tried.  To be sure,

this unusual posture does not affect the viability of the qualified

immunity defense.  See Lampkins v. Thompson, 337 F.3d 1009, 1014

(8th Cir. 2003) (describing such a posture as "procedurally

unusual," but emphasizing that "the qualified immunity defense is

not waived or lost if a case proceeds to trial"); Johnson v.

Breeden, 280 F.3d 1308, 1317 (11th Cir. 2002) ("Defendants who are

not successful with their qualified immunity defense before trial

can re-assert it at the end of the plaintiff's case in a Rule 50(a)

motion.").  And, ultimately, "the procedural posture in which

[Wilson's] appeal arises [does not] greatly influence the standard

of review."  Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999).

Typically, we review a dismissal or grant of summary judgment de

novo and construe the allegations or evidence in the light most

favorable to the non-movant.  See id. at 22.  In the present

circumstance, "[w]hen a qualified immunity defense is pressed after

---

[10]Genuine disputes concerning material facts must be resolved
by the jury, Suboh, 298 F.3d at 90, perhaps by special verdict
form, see, e.g., Singh v. Blue Cross/Blue Shield of Mass., Inc.,
308 F.3d 25, 35 n.9 (1st Cir. 2002).  However, whether the
officer's conduct was objectively reasonable under a given set of
facts is a question of law for the court.  See Suboh, 298 F.3d at
90; St. Hilaire, 71 F.3d at 24 & n.1.

-17-

a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial." Id. at 23. Since Wilson was both the non-movant at the summary judgment stage and the victor before the jury, it makes little difference that we review the qualified immunity question after trial instead of before it. In either case, we construe the facts in the light most favorable to Wilson, and decide legal questions de novo.

Having completed that detour, we begin with the first stage of the qualified immunity analysis, and inquire whether the evidence at trial, viewed in the light most favorable to the verdict, is legally sufficient to support the jury's verdict that the plaintiff was deprived of a constitutional right.

**A.     The First Prong**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." While the text of the amendment only mentions probable cause in the context of issuing a warrant, decades of case law have established that a warrantless arrest also requires probable cause. E.g., United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997).[11]

---

[11]The district court analyzed Wilson's detention as if it were not an arrest, but rather an investigatory stop within the meaning of Terry v. Ohio, 392 U.S. 1 (1968). Under Terry and its progeny,

Most arrests fall into one of several common patterns. In the first scenario, an officer without a warrant suspects that a certain person has just committed, or is about to commit, a crime. In that case, "[p]robable cause for an arrest exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004).

In a second arrest scenario, "a law enforcement officer [purporting to have] information amounting to probable cause directs an officer who lacks the knowledge to make the arrest." Meade, 110 F.3d at 193. In such cases, "we 'impute' to the arresting officer the directing officer's knowledge," and thus the arrest stands or falls on what the directing officer knew, not what the arresting officer knew. Id.

In a third scenario, a magistrate has issued a warrant for a suspect's arrest. In that case, we essentially ignore the arresting officer's knowledge; the officer need not know anything more than that a facially valid arrest warrant has issued. Rather,

_____

"police officers who suspect criminal activity [can] make limited intrusions on an individual's personal security based on less than probable cause." Michigan v. Summers, 452 U.S. 692, 698 (1981). However, both Captain Dunford and Officer Mitchell testified unambiguously that Wilson was under arrest. At any rate, appellees do not argue on appeal that Wilson's arrest should be treated as a mere Terry stop, and we see no reason to treat it as one.

-19-

we focus entirely on the magistrate's knowledge to determine if the magistrate had "a substantial basis for determining the existence of probable cause." Illinois v. Gates, 462 U.S. 213, 239 (1983).

These paradigms do not adequately capture the situation here. Since there was no warrant for Wilson's arrest, this case cannot fall in the third category. But it does not comfortably fit in the first or second categories either. No officer even purports to have drawn the conclusion "that a crime ha[d] been (or [was] about to be) committed and that [Wilson] likely [was] one of the perpetrators," Acosta, 386 F.3d at 9.

It is perhaps natural, and appellees understandably seize upon the temptation, to misframe the question. Instead of asking whether there was probable cause to believe that Wilson had committed a crime, appellees pose the issue as whether there was probable cause to believe that a warrant had been issued for her arrest. That is not the correct analysis; it wrongly conflates the Fourth Amendment question of probable cause with the § 1983 question (under the third prong of the qualified immunity test) of objective reasonableness. As the Saucier framework makes clear, courts must first answer the constitutional question as if there were no such thing as qualified immunity, and only then ask whether the additional protections of qualified immunity are available. See 533 U.S. at 201. We must remember that "the reasonableness standards underlying the probable cause and qualified immunity

-20-

inquiries are not coterminous." Iacobucci, 193 F.3d at 23. In particular, qualified immunity allows for a wider range of mistakes. See Cox, 391 F.3d at 31. Qualified immunity "eschews a line that separates the constitutional from the unconstitutional and instead draws a line that separates unconstitutional but objectively reasonable acts from obviously unconstitutional acts." Id. at 31. In determining whether the Fourth Amendment was violated, we must rigorously draw precisely the line that qualified immunity eschews -- between the constitutional and the unconstitutional -- and not erroneously import the wider latitude afforded by § 1983 into the Constitution itself.

Under these basic principles, the Fourth Amendment is not satisfied simply because the police had an objectively reasonable belief that there was a warrant for Wilson's arrest. Indeed, the Fourth Amendment would not necessarily be satisfied even if the police correctly believed that there was a warrant for her arrest. The Fourth Amendment requires that a warrant must be supported by probable cause. See U.S. Const. amend. IV; Gates, 462 U.S. at 239. And the probable cause that must ground a warrant cannot simply be "probable cause to believe that there is a warrant."

In short, the ultimate question for determining whether an arrest violates the Fourth Amendment is, in this context as in any other, whether there was probable cause to believe that the

arrestee had committed or was committing a crime.[12]  Under this

analysis, Wilson's arrest violated the Fourth Amendment.  No

officer ever formed the conclusion "that a crime ha[d] been (or

[was] about to be) committed and that [Wilson] likely [was] one of

the perpetrators," Acosta, 386 F.3d at 9.  Nor did any magistrate.

Rather, this is a case where each officer thought that some other

officer had convinced a magistrate to issue a warrant for Wilson's

arrest.  And an arrest is not valid simply because the arresting

officer thinks that a second officer has adequate justification to

arrest a particular person.  In such cases, the validity of the

arrest turns on whether the second officer actually did have

adequate justification to arrest that person:

> Certainly police officers called upon to aid
> other officers in executing arrest warrants
> are entitled to assume that the officers
> requesting aid offered the magistrate the
> information requisite to support an
> independent judicial assessment of probable
> cause. Where, however, the contrary turns out
> to be true, an otherwise illegal arrest cannot
> be insulated from challenge by the decision of
> the instigating officer to rely on fellow
> officers to make the arrest.

---

[12]Of course, whether a particular remedy is available for the
Fourth Amendment violation may turn on whether the arresting
officer reasonably relied on information that, in retrospect, did
not constitute probable cause.  The good faith exception to the
exclusionary rule in criminal cases, see United States v. Leon, 468
U.S. 897, 922-23 (1984), and the qualified immunity defense in
§ 1983 cases, limit the remedies available when police violate the
Fourth Amendment based on a reasonable, good-faith misunderstanding
of the law or facts.  But before determining whether a remedy is
available, we must first determine whether the Fourth Amendment has
even been violated.

Whiteley v. Warden, 401 U.S. 560, 568 (1971); see also United States v. Hensley, 469 U.S. 221, 231 (1985) (the validity of an arrest based on a police bulletin "turns on whether the officers who issued the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance") (emphasis omitted); Meade, 110 F.3d at 194 n.2 ("If . . . the directing officer lacked probable cause to order the arrest, then the arrest itself is unlawful regardless of the arresting officer's otherwise proper reliance.").

The only basis appellees offer to support a finding of probable cause is that most of the other people in the room did have warrants for their arrest which, we will assume, were supported by probable cause. But "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause" for a search or arrest. Ybarra v. Illinois, 444 U.S. 85, 91 (1979). Rather,

> [w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the 'legitimate expectations of privacy' of persons, not places.

Id. Whatever relevance the officers' preparations and confusion regarding Wilson's presence in the room may have for later stages of the qualified immunity analysis, see supra note 12, these factors do not add up to probable cause that Wilson had committed a crime. Consequently, the evidence presented at trial supported the jury's finding that Wilson's seizure was unreasonable, and hence that Captain Dunford, as the arresting officer, violated her Fourth Amendment rights.

## B.        The Second Prong

We now inquire "whether the constitutional right that the officer allegedly violated was 'clearly established' at the time of the incident such that it would 'be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Riverdale Mills, 392 F.3d at 65 (quoting Saucier, 533 U.S. at 202). "One tried and true way of determining whether this right was clearly established at the time the defendants acted, is to ask whether existing case law gave the defendants fair warning that their conduct violated the plaintiff's constitutional rights." Suboh, 298 F.3d at 93. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. On the other hand, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002). Consequently, "the salient

question . . . is whether the state of the law in [1999] gave [Dunford] fair warning that [his] alleged treatment of [Wilson] was unconstitutional." Id. Finally, we examine "not only Supreme Court precedent, but all available case law," Suboh, 298 F.3d at 93, including both federal cases outside our own circuit, Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 23 (1st Cir. 2001), and state court decisions of the state wherein the officers operated, Starlight Sugar, 253 F.3d at 144.

We conclude that pre-1999 case law gave police officers ample warning that arresting and detaining someone incorrectly swept up in a mass arrest sting aimed at individuals with outstanding arrest warrants would violate her Fourth Amendment rights. While the parties have not identified any cases in which this issue has arisen in the context of an entirely innocent person who unwittingly was caught in a planned mass arrest, courts have addressed two closely related situations.

First, it has been clearly established for decades that if one officer instructs another officer to make an arrest, the arrest violates the Fourth Amendment if the first officer lacked probable cause, regardless of how reasonable the second officer's reliance was. See Hensley, 469 U.S. at 231; Whiteley, 401 U.S. at 568; Meade, 110 F.3d at 193-94 & n.2.

Second, it was well established in other federal courts and in Massachusetts state court, if not in this circuit, that an

arrest made on the basis of a facially valid warrant which turns out to have been cleared before the arrest violates the Fourth Amendment. See, e.g., Murray v. City of Chicago, 634 F.2d 365, 366 (7th Cir. 1980) (ten weeks after court quashed and recalled a warrant for appellant's arrest, police arrested her on the basis of the warrant; court found it "clear that appellant sustained a violation of constitutional rights by being arrested and detained pursuant to an invalid warrant"); Commonwealth v. Hecox, 619 N.E.2d 339, 340-44 & n.2 (Mass. App. Ct. 1993) (where officer mistakenly believed that a warrant was outstanding for defendant's arrest, but in fact a warrant either never had issued or had been subsequently cleared, arrest pursuant to that warrant violated Fourth Amendment);[13] see also McMurry v. Sheahan, 927 F. Supp. 1082, 1088 (N.D. Ill. 1996) (holding that it was clearly established for § 1983 purposes that an arrest founded upon a recalled warrant violates the Fourth Amendment).

If it was clearly established that the Fourth Amendment proscribes an arrest based on a warrant that was once valid but has since been cleared, then a fortiori it was clearly established that the amendment proscribes an arrest based on a warrant that never

---

[13]See also Wayne R. LaFave, 2 Search & Seizure § 3.5 & n.105 (4th ed. 2004) (noting that "[w]hen the nature of the mistake is that an arrest was made pursuant to an arrest warrant which in fact was quashed before the arrest was made, court[s] are particularly ready to assert that . . . the Fourth Amendment has been violated," and collecting state cases).

existed in the first place. Taken together, the two principles cited above -- that an arrest based on a request by another officer is lawful only if the first officer had probable cause, and that an arrest based on a facially valid, but actually recalled, warrant violates the Fourth Amendment -- gave unmistakable warning to Massachusetts police that the Fourth Amendment prohibits arresting someone solely on the basis of a nonexistent warrant. We therefore conclude that the second prong has been satisfied.

## C.        **The Third Prong**

The final prong of the qualified immunity analysis, often the most difficult one for the plaintiff to prevail upon, is "whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right." Starlight Sugar, 253 F.3d at 141. Section 1983 actions "frequently turn on the third prong of the qualified immunity inquiry, which channels the analysis from abstract principles to the specific facts of a given case." Cox, 391 F.3d at 31. "It is not always evident at the time an official takes an action that a clearly established right is involved. For example, the factual situation might be ambiguous or the application of the legal standard to the precise facts at issue might be difficult; in either case the officer's actions may be objectively reasonable and she may be entitled to qualified immunity." Riverdale Mills, 392 F.3d at 61. "Because 'the concern of the immunity inquiry is to

acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct,' even where a plaintiff has shown . . . that a government official may have deprived him of a clearly established constitutional right, qualified immunity remains available to defendants who demonstrate that they acted objectively reasonably in applying clearly established law to the specific facts they faced." Burke v. Town of Walpole, 405 F.3d 66, 86 (1st Cir. 2005) (quoting Saucier, 533 U.S. at 205).[14]

In this case, the "added measure of protection" provided by qualified immunity, Cox, 391 F.3d at 31, suffices to protect Dunford. To be sure, the objective reasonableness of Wilson's detention deteriorated as events unfolded. At the beginning of the encounter, when she was simply one of a hundred people in a convention hall that was supposedly carefully screened to contain only police officers and persons with outstanding arrest warrants, the odds were extremely high that there was a warrant for Wilson's arrest. That fact made it objectively reasonable for an officer in Dunford's position to believe that arresting Wilson would not violate the Fourth Amendment.

Later, when the police became aware that the carefully prepared processing table contained no folder or photograph for

---

[14]This principle reflects the difference between the probable cause standard under the Fourth Amendment and the objective reasonableness standard under the third prong of the § 1983 qualified immunity test. See supra Part III.A.

her, the reasonableness of her continued detention diminished. Nevertheless, the police could have hypothesized that her folder had been misplaced, and it was not objectively unreasonable to delay releasing her from custody pending final verification of her status. See Rogers v. Powell, 120 F.3d 446, 456 (3d Cir. 1997).

There remains the approximately thirty minutes during which the police completed routine paperwork and awaited a cuff cutter after they had reached the inescapable conclusion that there had never been a warrant for Wilson's arrest. Although the issue is close, we conclude that Dunford continued to enjoy qualified immunity during this final thirty minutes of detention. Cf. id. at 456-57 (holding that police did not enjoy qualified immunity for a period where they acknowledged that plaintiff had to be released, but nevertheless kept him handcuffed). After confirming Wilson's identity and her lack of a warrant, Dunford ordered the officers to release her; subsequent delay arose from routine paperwork and time waiting for a "cuff cutter" to arrive. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). The delay in effecting Wilson's release, while undoubtedly exasperating to her, was due to simple administrative inefficiency, not plain

incompetence or knowing violation of the law.  Consequently, we affirm the district court's judgment in favor of Dunford.[15]

### IV.

We now address the City's liability.  The district court granted summary judgment for the City because there was insufficient evidence that Operation Goodwin was a City policy.  We review a grant of summary judgment de novo, viewing the record in the light most favorable to the non-movant.  Rosenberg v. City of Everett, 328 F.3d 12, 17 (1st Cir. 2003).

The fact that Dunford prevailed on the qualified immunity defense does not help the City.  Municipalities cannot assert qualified immunity.  See Owen v. City of Independence, 445 U.S. 622, 650 (1980).  And the jury did find that Wilson suffered a constitutional injury.  However, "a municipality cannot be held liable solely because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  Rather, a municipality is liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Id. at 694.

---

[15]Because the qualified immunity question should not have been submitted to the jury in the first place, see supra note 10, we do not owe any deference to the jury's answer to that question.

Wilson argues that her injury stemmed from City policy because Captain Dunford had final authority to establish such policy for Operation Goodwin.[16] See Pembaur v. City of Cincinnati, 475 U.S. 469, 481-83 (1986) (plurality opinion) (describing the level of decision-making authority necessary to establish municipal liability); Cordero v. De Jesus-Mendez, 867 F.2d 1, 7-8 (1st Cir. 1989) (acknowledging Pembaur plurality opinion as law of this circuit). Pembaur held that

> [m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. . . . [P]articular officers may have authority to establish binding [city] policy respecting particular matters and to adjust that policy for the [city] in changing circumstances. . . . We hold that municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

475 U.S. at 481-83. "An unconstitutional policy . . . may be inferred from a single decision or act . . . [but] the isolated action must be taken by a municipal official with 'final policy-making authority' in the relevant area of the city's business." Roma Constr. Co. v. aRusso, 96 F.3d 566, 576 (1st Cir.

---

[16]Wilson also fleetingly adverts to the allegedly inadequate training of the line officers in how to react if an innocent bystander was caught in the sting. If this is supposed to be an argument that there was a policy of inadequate training, we deem it waived by insufficient argumentation. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

1996) (quotation marks and citation omitted; alterations in original).

Not every police operation is a municipal policy; Wilson has the burden of establishing that this particular operation was City policy. She argues that Operation Goodwin was City policy because it was (1) a large operation involving arrest warrants from all over Boston, (2) commanded by a high-ranking officer, and (3) videotaped for national distribution. Those facts, however, do not make it an official City policy. Wilson offers no evidence that Dunford -- then a captain assigned to a station in Dorchester, subject to the hierarchical supervision of a Deputy Superintendent, Superintendent, and Police Commissioner -- had the authority to set municipal policy for the City of Boston. We therefore affirm the district court's grant of summary judgment for the City.

## V.

We conclude that the jury's finding that Captain Dunford violated Wilson's Fourth Amendment rights is supported by the evidence. However, as a matter of law, Dunford is not liable because he enjoys qualified immunity, and the City is not liable because there was insufficient evidence that Operation Goodwin was City policy.

**Affirmed**.