# United States Court of Appeals
## For the First Circuit

No. 05-2375

BARRY HIGGINS,

Plaintiff, Appellant,

v.

PENOBSCOT COUNTY SHERIFF'S DEPARTMENT; GLENN ROSS,
SHERIFF, PENOBSCOT COUNTY; JOSHUA TIBBETTS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Margaret Kravchuk, U.S. Magistrate Judge]
[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Torruella, Circuit Judge,

Stahl, Senior Circuit Judge,

and Howard, Circuit Judge.

Julie D. Farr, with whom Charles E. Gilbert, III and Gilbert
& Greif, P.A. were on brief, for appellant.
Cassandra S. Shaffer, with whom Peter T. Marchesi and
Wheeler & Arey, P.A. were on brief, for appellees.

April 14, 2006

**Per Curiam**.  This case arises from an incident in which defendant Joshua Tibbetts, a deputy sheriff with the Penobscot County Sheriff's Department, issued plaintiff Barry Higgins a no-trespass warning and ordered him to leave the T & N Trailer Park in Carmel, Maine.  The district court granted the defendants (Tibbetts, Tibbetts' supervisor Sheriff Glenn Ross, and the Department itself) summary judgment on Higgins' claims that defendants deprived him of his Fourth and Fourteenth Amendment rights and certain other rights secured him under Maine common law.  The court also granted defendants judgment on the pleadings on Higgins' claim under Maine's unlawful eviction statute, 14 M.R.S.A. § 6014.  Higgins brings this appeal to challenge these rulings.

The incident giving rise to this case occurred on May 16, 2002.  The undisputed facts and the disputed facts taken in a light favorable to Higgins, see, e.g., APG, Inc. v. MCI Telecommunications Corp., 436 F.3d 294, 297 (1st Cir. 2006), are that Higgins awoke that morning in an apartment over a garage built on a lot within the trailer park. While he was drinking coffee in his robe, Higgins heard someone closing a door below, in the garage.  Higgins opened the door to the apartment and saw his sister Irene standing outside near the base of a ladder that he had used to access the apartment.  (Apparently, there previously was a deck with steps leading up to the apartment, but the deck and steps had been removed).  Higgins asked Irene what she was doing in his

-2-

garage. Irene retorted that Higgins had no right to be there and that she was going to call the sheriff. But before she could do so, Higgins called the sheriff's department and asked for assistance.

There had been a long-running dispute between Higgins and his family over Higgins' rights vis-à-vis the building and certain of its contents. Those members of Higgins' family who have submitted evidence in this case deny that Higgins had any right to be in the building on the day of the incident. Higgins responds that, at the very least, he had a tenancy interest in the building. He alleges that he and his father, Leo, formed a partnership and purchased the trailer park in 1972, agreeing at the time that all members of the Higgins family would have a lifetime right to reside there. Higgins says that he paid for and built the apartment and garage, completing construction in 1981, and that he "resided" in the building from 1981 to the day of the incident. Higgins admits to having spent significant periods of time out of state beginning in the late 1990s, and to having signed his partnership interest over to his father during his divorce proceedings in 1989, with the as-yet unrealized expectation that his father would deed the interest back to him after the proceedings concluded. But he maintains that his "long-term possession and occupancy of the building, at a minimum, give rise to a tenancy interest, even in the absence of agreement with his father as to its terms."

Deputy Tibbetts was dispatched to the trailer park in response to Higgins' call. Upon arriving, Tibbetts encountered what Higgins described in his deposition as a "screaming contest" involving, at the very least, himself and his sisters Irene and Cynthia, as well as Cynthia's husband David Prescott. Higgins informed Tibbetts that he and his father were engaged in an ongoing disagreement over ownership of the property and his right to reside there. Leo showed up a short time later with a copy of the deed, which he showed to Tibbetts, telling him that he previously had notified Higgins to stay off the property. Leo asked Tibbetts to bar Higgins from the property. Higgins informed Tibbetts that the police had more than once been summoned to mediate the issue but always had declined to involve themselves, telling Higgins and Leo that it was a "civil dispute and that [they] would not get involved."

In due course, Tibbetts issued Higgins the no-trespass order that is the subject of this lawsuit and gave him several minutes to collect some personal belongings from the apartment. Several facts, in addition to Leo's apparent ownership of the building, led Tibbetts to believe that Higgins was a trespasser and was not lawfully entitled to occupy the apartment: the truck Higgins had parked outside the building had Connecticut license plates; there were no stairs, only a ladder, to access the building's apartment; and Tibbetts had driven past the building on

"many, many" prior occasions and it always had appeared vacant -- i.e., there never were any lights on, there never were any vehicles parked outside, and there was "lots of junk in the dooryard that was always in the same place."  (The word "dooryard," as used colloquially in northern New England and eastern Canada, typically refers to the area outside the most commonly used entrance to a residence, and often includes the driveway.  See Walt Whitman, When Lilacs Last in the Dooryard Bloom'd (1865-66)).  Tibbetts told Higgins that he would be arrested if he did not leave or if he returned to the property.  Higgins says that he asked Tibbetts to look in the apartment and to take note of the personal property that he would be leaving behind, but Tibbetts refused.  Higgins says that, after he complied with Tibbetts' order and departed, a great deal of his personal property disappeared from the building.

Eventually, Higgins filed this action.  He asserted three federal civil rights claims:  that his "eviction" constituted (1) a "meaningful interference with . . . [his] possessory interests" in his residence, and thus an unlawful seizure in violation of the Fourth Amendment, see Soldal v. Cook County, 506 U.S. 56, 61 (1992) (citation and internal quotation marks omitted); (2) an abridgment of his right to procedural due process protections before the seizure, see Fuentes v. Shevin, 407 U.S. 67, 87 (1972); and (3)  a violation of his right to have had Tibbetts properly trained and supervised by the other defendants, see, e.g., City of Oklahoma

City v. Tuttle, 471 U.S. 808, 813-24 (1985). He also asserted state law claims for conversion of his personal property and the infliction of emotional distress. Finally, as noted at the outset, Higgins pressed a claim under Maine's unlawful eviction statute, 14 M.R.S.A. § 6014.

Following discovery, the defendants moved for summary judgment on all claims except the claim for wrongful eviction, on which they moved for judgment on the pleadings. The matter was referred to a magistrate judge, who issued a thorough and carefully reasoned report recommending that the defendants' motions be granted. The magistrate judge expressed considerable doubt that a viable constitutional claim was stated under either the Fourth or Fourteenth Amendments, but concluded that, in any event, the defendants should be entitled to qualified immunity from the claims because they had not violated Higgins' "clearly established" rights. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Anderson v. Creighton, 483 U.S. 635, 640 (1987). The magistrate judge further concluded that the defendants should be statutorily immune from liability on Higgins' conversion and infliction of emotional distress claims, Tibbetts because he was exercising a discretionary function when he issued the no-trespass order and did not act in bad faith, see 14 M.R.S.A. § 8111(1)(c) & (E), and the remaining defendants because of absolute governmental-entity immunity, see 14 M.R.S.A. § 8103(1). Finally, the magistrate judge

-6-

rejected Higgins' claim for unlawful eviction because, inter alia, the statute only authorizes a cause of action against a "landlord," and not against his agent. The district court accepted the magistrate judge's recommended rulings insofar as they were premised on the reasoning just summarized, and Higgins brought this appeal to challenge these rulings.

The lower court opinions more than adequately explain why the defendants are entitled to summary judgment in this case, so we are content to affirm largely on the basis of those opinions. See, e.g., Vargas-Ruiz v. Golden Arch Devel. Corp., 368 F.3d 1, 2 (1st Cir. 2004). We add only a few remarks about Higgins' constitutional claims against Tibbetts. Higgins premises these claims on the threshold assertion that the untrained Tibbetts subjected him to an unlawful eviction. We do not doubt that, in certain circumstances, a police officer's participation in an unlawful eviction can implicate a tenant's Fourth and Fourteenth Amendment rights and give rise to liability under 42 U.S.C. § 1983. Cf. Soldal, 506 U.S. at 61; Fuentes, 407 U.S. at 87. At least arguably, then, Higgins has adduced enough evidence to meet the first two parts of this circuit's tripartite qualified-immunity inquiry. See, e.g., Wilson v. City of Boston, 421 F.3d 45, 52 (1st Cir. 2005) (summarizing the first two questions the court should ask as: "(1) whether the claimant has alleged the deprivation of an actual constitutional right; [and] (2) whether the right was

clearly established at the time of the alleged action or inaction . . ."); <u>Riverdale Mills Corp.</u> v. <u>Pimpare</u>, 392 F.3d 55, 60-61 (1st Cir. 2004) (similar).

In our view, the viability of Higgins' constitutional claims against Tibbetts depends on whether, to the extent that what happened properly can be found to have been an "eviction" at all, Tibbetts could be found to have known that it was an unlawful eviction. Such a finding is necessary if Higgins is to clear the final hurdle presented by the qualified-immunity defense Higgins has interposed. <u>See</u> <u>Wilson</u>, 421 F.3d at 52 (observing that, at the third prong of this circuit's qualified-immunity inquiry, the plaintiff must establish that "an objectively reasonable official would have believed that the action taken violated [the previously identified] clearly established right"); <u>see</u> <u>also</u> <u>Riverdale Mills</u>, 392 F.3d at 61 ("It is not always evident at the time an official takes an action that a clearly established right is involved. For example, the factual situation might be ambiguous or the application of the legal standard to the precise facts at issue might be difficult; in either case the officer's action may be objectively reasonable and she may be entitled to qualified immunity.").

One could not reasonably find in Higgins' favor on this issue. As set forth above, Tibbetts encountered a volatile and potentially dangerous situation -- described by Higgins himself as

a "screaming contest" -- when he arrived at the trailer park. The subject of the dispute was a man who, so far as Tibbetts could tell, was driving a truck with out-of-state license plates, and who claimed a right to occupy a building with which Tibbetts was familiar and which Tibbetts reasonably thought, based on his prior knowledge of the building and the circumstantial evidence at the scene, to have been long unoccupied. The man provided no written lease or other documentation to support his claimed occupancy right, but only made a conclusory verbal claim of entitlement. Opposing this man were several members of his own family, all of whom disputed his claimed entitlement and informed Tibbetts that he previously had been told to stay away, and one of whom -- the man's father -- produced a deed which substantiated the father's claim of ownership of the property.

"Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Wilson, 421 F.3d at 58 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). In these circumstances, Tibbetts' decision to disbelieve Higgins and to defuse the situation by asking him to leave under threat of citation for trespass was neither plainly incompetent nor involved a deliberate violation of the law. Given the paucity of evidence that Higgins was entitled to occupy the property and the abundance of evidence pointing the other way, Higgins' argument essentially invites us to hold, as a matter of constitutional law, that a

police officer, summoned to mediate a volatile dispute involving an alleged trespasser, is obliged to leave the situation unresolved simply because the trespasser represents himself to be entitled to be there.  To state the proposition is to expose its foolishness.

**Affirmed**.


**Concurring opinion follows.**

**HOWARD, Circuit Judge, concurring in the judgment.** The opinion of the court applies the three-part qualified immunity analysis called for in our recent cases and concludes that Tibbetts is entitled to qualified immunity at prong three. See, e.g., Wilson v. City of Boston, 421 F.3d 45, 52-59 (1st Cir. 2005); Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 60-66 (1st Cir. 2004); Suboh v. District Atty's Office, 298 F.3d 81, 90-96 (1st Cir. 2002); Abreu-Guzman v. Ford, 241 F.3d 69, 73-74 (1st Cir. 2001). I write separately because I believe that Tibbetts should have prevailed on the initial inquiry -- whether he violated Higgins' constitutional rights -- and more generally to urge consideration of a return to the "two-step process," Brosseau v. Haugen, 543 U.S. 194, 195 (2004), traditionally employed in qualified immunity cases. I do so because our three-step process invites erroneous holdings and, possibly, erroneous outcomes, especially in Fourth Amendment cases.

For most of the last decade, this court has usually asked three questions when evaluating whether a government actor is entitled to qualified immunity: (1) Does the official conduct in question, as alleged, constitute the violation of an actual federal right? (2) If so, was the right so clearly established at the time of the alleged violation that a reasonable official would have been on notice that the conduct was unconstitutional? (3) If so, would a reasonable official have understood that the conduct violated the

-11-

clearly established right at issue?  E.g., Wilson, 421 F.3d at 52; but see Riverdale Mills, 393 F.3d at 61 n.5 (acknowledging that we sometimes still follow a two-step process).  A negative answer to question one means that there has been no violation of a federal right; a negative answer to question two or three gives rise to qualified immunity insofar as plaintiff is seeking money damages from the defendant.

The second and third questions we ask derive from an elaboration of the two-step process described in the Supreme Court's qualified-immunity cases.  The two-step test directs courts evaluating assertions of qualified immunity to ask:  (1)  Do the specific case facts alleged describe a violation of a federal right?  (2)  If so, should the defendant, who is charged with knowledge of clearly established law, have known that the conduct in question violated that right?  See Saucier v. Katz, 533 U.S. 194, 201-02 (2001); see also Riverdale Mills, 392 F.3d at 60-61 (observing that the second and third questions this circuit usually asks involve an expansion of the inquiry prescribed by the Supreme Court).

Our elaboration seems to have been prompted, at least in part, by a desire to emphasize that official defendants should not be held liable in situations where they have made reasonable mistakes about the facts of the situation they confront, as well as reasonable mistakes as to whether, in light of clearly established

law, their conduct infringed a federal right.  See, e.g., Wilson, 421 F.3d at 57-58; Riverdale Mills, 392 F.3d at 61; Suboh, 298 F.3d at 96.  The issue of mistaken factual (as opposed to legal) judgments frequently arises in civil rights actions alleging Fourth Amendment violations, where the constitutionality of an official's conduct turns not on post hoc judgments about whether the search or seizure was justified or properly calibrated, but on whether it was reasonable under the tense, uncertain, and rapidly evolving circumstances that the official confronted.  See Saucier, 533 U.S. at 204-05 (discussing Graham v. Connor, 490 U.S. 386 (1989)).  But this is not exclusively a Fourth Amendment problem; the issue of mistaken factual judgments arises in other constitutional settings as well.  See, e.g., Dirrane v. Brookline Police Dept., 315 F.3d 65, 69-70 (1st Cir. 2002) (applying a fact-based balancing test to determine the viability of claimed First Amendment violation in the case of a government whistleblower disciplined for "disruptive speech"); Suboh, 298 F.3d at 90-92 (applying a fact-based balancing test to determine the viability of alleged infringements of the right to "familial integrity," protected by the Fourteenth Amendment's Due Process Clause, in a child-custody dispute).

Of course, officials should not be made to pay damages for reasonable but mistaken factual judgments made in circumstances such as these.  But the reason they should not be held liable is that an official who acts reasonably vis-à-vis the plaintiff has

-13-

not violated the plaintiff's constitutional rights -- even if the invasion in question proves unwarranted with the benefit of 20/20 hindsight. See Illinois v. Rodriquez, 497 U.S. 177, 183-89 (1990) (emphasizing that the Fourth Amendment does not protect against searches and seizures that prove to have been unwarranted, but only against searches and seizures that were unreasonable). In such a situation, the qualified-immunity defense should not even be addressed because its necessary antecedent -- the presence of a viable claim for the invasion of a federal right -- is lacking. Our recent qualified-immunity cases obscure this point by suggesting that reasonable factual errors, like reasonable legal errors, are grist for the qualified-immunity mill, and are not to be analyzed as part of the threshold federal-right issue.

Our recent opinion in Wilson is instructive, consistent as it is with our other recent precedent. In that case, a woman who was mistakenly arrested pursuant to a sting operation designed to capture a large number of persons with outstanding arrest warrants sued the arresting officer for money damages, claiming that he violated her Fourth Amendment rights. See 421 F.3d at 47. In conducting our three-part qualified immunity analysis, we determined that, under the facts alleged, the arresting officers indeed had violated the plaintiff's right to be free from an erroneous arrest, and that it should have been clear to the arresting officer, under prevailing clearly established law, that

-14-

his conduct was unlawful. See id. at 54-57. In other words, we answered our first two qualified-immunity questions in the affirmative. See id. Nonetheless, we concluded that the officer was entitled to qualified immunity. See id. at 57-59. We reasoned that the officer reasonably, although mistakenly, believed that there was an outstanding warrant for the plaintiff's arrest, and that he acted reasonably in promptly ordering the plaintiff's release upon learning of the error. See id.

The defendant in Wilson was not simply entitled to avoid damages liability because of the qualified-immunity doctrine; he was entitled to a merits dismissal of the plaintiff's Fourth Amendment claim because his conduct was reasonable under the circumstances. See Rodriquez, 497 U.S. at 183-89. In other words, he did not violate the plaintiff's Fourth Amendment rights. See id. The factual analysis performed at step three should have been performed at step one, and should have yielded the conclusion that there was no constitutional violation. Regrettable as incidents of mistaken arrest such as this may be, American citizens simply do not have a free-standing Fourth Amendment right not to be arrested erroneously. Cf. id. at 184 ("If a magistrate, based upon seemingly reliable but factually inaccurate information, issues a warrant for the search of a house in which the sought-after felon is not present, has never been present, and was never likely to have been present, the owner of that house suffers one of the

-15-

inconveniences we all expose ourselves to as the cost of living in a safe society; he does not suffer a violation of the Fourth Amendment."). The right protects only against <u>unreasonable</u> arrests -- i.e., unreasonable mistakes about the perceived facts giving rise to the arrest.

I would not write separately if my concern were merely theoretical. Although the results in <u>Wilson</u> and this case remain the same whether we hold that there has been no invasion of a right or that there has been a reasonable mistake of fact made in connection with the invasion of the right, that is so only because the plaintiff in each case sought only monetary damages, and not declaratory or injunctive relief (against which the qualified-immunity doctrine is not a shield, <u>see</u> <u>Torres Rivera</u> v. <u>Calderon Serra</u>, 412 F.3d 205, 212 (1st Cir. 2005)). We should not hold or imply, as we are invited to do in our tripartite elaboration of the qualified-immunity analysis, that a government official violates the Constitution when she makes a reasonable but mistaken factual judgment that a particular situation calls for a forceful intervention by her office. The traditional two-step qualified immunity analysis, still employed by the Supreme Court, does not permit this error, for it channels consideration of issues of reasonable mistakes of fact into the initial inquiry: whether there has been an invasion of a federal right. <u>See</u> <u>Brosseau</u>, 543 U.S. at 195.

We should return to the two-step inquiry employed by the Supreme Court.