MARGIE C. MARTIN *et al.*, Plaintiffs-Appellees, v. BEN SEE, Defendant-Appellant.

Fourth District    No. 4—91—0731

Opinion filed August 6, 1992.

Bobby F. Sanders, of Marshall, for appellant.

Gregory C. Ray and David A. Mack, both of Craig & Craig, of Mattoon, and Randolph M. Rich, of Marshall, for appellees.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiffs were granted implied easements by way of necessity over defendant's land for farming purposes only. Defendant appeals, contending the trial court's decision was against the manifest weight of the evidence. We affirm.

The basis of this lawsuit involves the use of a private road which adjoins three tracts of land located in Anderson Township, Clark County. A map depicting the land involved is attached to and made a part of this opinion. The road in question runs north to south for approximately one-quarter of a mile from a public road which generally runs east to west. The road in question ends in the northwest corner of defendant's property.

Tract I and the road in question are owned by defendant. Plaintiffs Margie Martin and Dean Martin (Martins) own Tract II (the Martin property), which is located directly north of defendant's property. The road in question runs south and forms the western boundary of the Martin property. Plaintiffs William Henry Wilson and Paul Henry Wilson (Wilsons) own Tract III (the Wilson property), which lies west of the Martin property. The road in question runs along the eastern boundary of the Wilson property. Sandy Branch Creek divides the Wilson property into western and eastern portions. The eastern portion of the Wilson property is bounded on the north by property owned by Arthur Shotts and on the east by defendant's property.

Lola Davis testified she was Margie Martin's mother and had lived on the Martin property from 1964 through 1980. Prior to living on the Martin property, Davis resided on land southwest of the Martin property, which was then known as the Kile property. Davis testified that since the time she resided on the Kile property, the road in question had been used openly by cars and farm equipment. Finally, Davis testified she has never seen any gates along the road, never asked permission to use the road and that she has always used the road to gain access to her house.

On cross-examination, Davis testified other cars used the road to gain access to her house as well as to defendant's house. Davis stated there used to be a fence on the west side of the road that ran parallel to the road but that the fence was removed sometime after 1964.

Margie Martin testified she is the present owner of the Martin property and has been familiar with this land and the road since 1964 when her mother moved onto the property. Margie testified friends and relatives use the road to come visit her and the road was also used to gain access to the farmland. She also indicated she had seen various hunters use the road to gain access to land south of defendant's land. Margie testified she had never seen any barricades, gates, or "no trespassing" signs on or near the road. Finally, Margie stated she had never asked defendant for permission to use the road because she believed defendant did not own the road.

Mike Huffington testified he has been a farmer for approximately 25 years. He tenant farmed what is now the Martin property from 1978 to 1988. Huffington testified his grandfather owned the land which is now owned by the Martins for at least 10 years and he used the road to visit his grandfather as well as to farm the land. At no time did he ever ask permission from anybody to use the road. While using the road, Huffington often saw the Wilsons and their tenant farmers also using the road to gain access to the land. Huffington never encountered gates, barricades, or "no trespassing" signs on the road. Huffington stated he used the entire length of the road which was approximately one-fourth of a mile. Finally, he testified the road is the only means of access to the Martin and Wilson properties for purposes of farming. Huffington testified on cross-examination that he was under the impression the road was a public road.

Paul Henry Wilson testified his father, William Henry Wilson, entered into a contract for deed in 1957 or 1958 and acquired title to the Wilson property in 1963 or 1964. Paul testified that since 1958 the road has been used freely by his family and the Martins for farming activities as well as access to land south of defendant's land for hunting and picnicking. As far as he knew, there were never any gates or restrictions on the use of the road. At least three times Paul observed the township maintaining the road and also observed other people using the road for various purposes. Paul testified their tenant farmers have always used the road to gain access to the back side of their property and they never asked for permission to use the road. He testified the distance between the northern-most point of the road and where the turnoff to gain access to his property is located is approximately one-eighth of a mile.

On cross-examination, Paul testified he and his father had a discussion with defendant in the fall of 1989 regarding the use of the road at which time Paul first asked defendant for permission to use the road. Defendant gave the Wilsons permission to use the road on the condition that they did not tear it up. However, Paul denied a further condition to

their use of the road was an acknowledgement that defendant owned it. The Wilsons offered to pay defendant $100 a year to use the road but defendant refused that offer. Paul testified they have an entrance to the western portion of their land off of the public road but have no means to cross Sandy Branch Creek in order to get to the eastern portion of their property.

On redirect examination, Paul explained that Sandy Branch Creek is a quicksand stream that has no bottom. By cutting down the bank and adding gravel to the creek, they were able to cross it to get to the east side of their property but had a truck and tractor get stuck in the creek while attempting to cross it.

John Boyer testified he is employed as a farmer in Anderson Township and is familiar with all three tracts of land involved in this matter. Boyer gave his opinion that, for farm equipment and purposes, there were no other feasible means of access to the eastern portion of the Wilson property other than by defendant's road.

Vern Wright testified he has been employed in farm management for 51 years and has owned farmland in Clark County since 1964. Wright stated he was born on the property he now owns and his father owned it before he did. Wright's property is located three-fourths of a mile west of the properties involved in this matter. He was familiar with the road in question and has so been since he was a child. Wright testified he rode his bike down that road as a child and used the road to gain access to land south of defendant's where he hunted and fished. Wright stated he attended social functions at the second house on the road, which would have been defendant's predecessor's house, while he was in high school. Wright stated he never asked permission to use the road because he believed it to be an open road. Finally, Wright testified he had to pass by the road to get to his parents' farm which, since 1965, he did at least two or three times a month. Wright stated he never saw the road blocked or barricaded, nor did he see, until recently, any "no trespassing" signs, fences or gates near or on the road. Wright estimated he had traveled the blacktop road which intersects with the road in question several hundred times over the last 50 years. On cross-examination, Wright admitted he had not actually driven down the road in question in 25 or 30 years.

Arthur Shotts testified he was 80 years old and has been a farmer in Clark County his entire life except for the 4½ years he served in the Army. Shotts owns 15 acres immediately west of the Martin property and immediately north of the Wilson property. Shotts and his son used the road approximately a dozen times a year to farm their land. He testified his land had been owned by his family since before 1922 and that

they had always used the road to gain access to their land. Before the institution of this lawsuit, Shotts had never seen the road blocked or barricaded in any way. Shotts stated he never asked permission to use the road and he had seen other people use the road to gain access to the Wilson property.

On cross-examination, he denied knowing who owned the road and denied ever asking defendant for permission to use the road. Shotts remembered there was a fence row with a gate on the west side of the road but it was years ago that it existed. Finally, Shotts testified "everybody" used the road to farm the land and as access to hunting and fishing on the land south of defendant's land.

Joseph Kemp testified he has lived about four or five miles south and east of the Wilson property since 1948. Kemp was familiar with the road in question. He testified that between 1948 and 1960 he used the road to gain access to the land behind defendant's house for hunting. He had never seen the road blocked or barricaded in any way nor seen any "no trespassing" signs on the road. Kemp testified he observed the Martins and their tenant farmers use the road to gain access to the land since that was the only way onto their land.

Herbert Spires testified he was the tenant farmer for the Wilsons in 1977 and that he used the road in question to gain access to the property. Spires did not ask anyone for permission to use the road and was never told he could not use the road. He stated he never observed any gates, barricades or "no trespassing" signs on the road.

Glen Heatherly, a tenant farmer for the Wilsons in 1982 and 1983, testified he used the road to gain access to the Wilson property and drove various farm equipment and other vehicles down the road. Heatherly further testified he never asked for permission from anyone to use the road and no one ever told him he could not use the road. He never saw any barricades, gates or "no trespassing" signs on the road.

Harold McConchie testified he was the tenant farmer for the Wilsons between 1984 and 1989 and stated he used the road for all farming purposes. He never asked anyone for permission to use it and had observed hunters using the road to gain access to the land south of defendant's property. Until the summer of 1989, he never saw any gates, barricades, or "no trespassing" signs on the road and recalled using that road to go hunting 20 years earlier.

On cross-examination, McConchie admitted there were two other means of access to the eastern portion of the Wilson property besides defendant's road; however, these involved either crossing Sandy Branch Creek or crossing through another person's property. He testified he went to defendant's house with Paul Henry Wilson and they discussed

the use of the road. McConchie testified that at this meeting, defendant claimed he owned the road and defendant further said he was not going to let anybody use it. Defendant and McConchie had a second meeting and McConchie testified defendant told him as long as he farmed the Wilsons' land he could use the road but that the Wilsons themselves could not use the road. McConchie further testified defendant offered to let him use the road for a $250 fee or McConchie could purchase the gates defendant desired to put on the road.

On redirect examination, McConchie explained these other means of access to the eastern portion of the Wilson property were very difficult to utilize because one access, located at the southeast corner of the Wilson property, is at the top of a large hill and the roads are too narrow for farm equipment. The other means of access requires crossing Sandy Branch Creek.

Ray Stone was the Wilsons' tenant farmer in 1985. He also used the road to gain access to the Wilson property and drove various types of farm equipment on the road. Stone did not ask for permission to use the road and was never told he could not use the road. He also never encountered any gates, barricades, or "no trespassing" signs on the road.

The plaintiffs' final witness was Omer Shawler, a real estate lawyer practicing in Clark County. Shawler testified he examined the abstract of title for the properties owned by the Wilsons, Martins, and defendant. Based on that examination, he concluded that in 1891, the land now owned by defendant and the Martins was owned by the Spittler family, who instituted a partition suit. The land was partitioned such that each of the three Spittler daughters received three acres of land and each of the Spittler sons received approximately 26 acres of land. The road in question forms the western boundary of the partitioned land.

Shawler testified that this partition suit left the northern-most tract of this land landlocked. Some of the landlocked northern tract of land is the land owned by the Martins. Shawler further testified that, based on the abstract of title, the partition suit allocated a strip of land approximately one rod (16½ feet) wide, which was on the west side of the partitioned property, to the southern-most tract. Finally, Shawler identified an affidavit of Ira Wallace made in 1973. He explained that the legal description in the affidavit described the property now owned by defendant, including the road in question. Shawler was of the opinion that at the time the affidavit was executed, Wallace owned the land described in the affidavit and was about to transfer title to somebody else. Shawler believed the affidavit was an attempt to correct a gap in the chain of title concerning the west two acres of land, which is the road in ques-

tion, originally allocated to the southern-most tract of land in the 1891 partition suit.

The first witness for defendant was Charles Blankenship, a 58-year-old farmer and the current road commissioner for Anderson Township, Clark County. Blankenship testified that he once applied gravel to the road as payment for work defendant did for the township. Blankenship testified that he believed there was access to the eastern portion of the Wilson property in the southeast corner of the Wilson property. He further testified that an irrigation ditch runs along the northern edge of the Martin property near the public road and that a tin culvert could be installed to allow access to the public road across the ditch.

Ira Wallace testified he was the son of Herman and Ida Wallace and that his niece, Sandra, was married to defendant. Ira had lived on the property which defendant now owns for approximately 20 years. He estimated that the land had been in his family for almost 70 years and that his family had always claimed ownership of the road. Ira testified the road in question was built in 1932 when his house was moved from the east side of the property to the west side of the property where defendant's house is now located. Ira stated there had been a fence line of trees that ran parallel to the road on the west side of the road at one time. According to Ira, in 1958, William Henry Wilson had a conversation with Ira's father wherein William Henry Wilson asked permission to use the road to gain access to the eastern portion of his property.

Ray Wallace testified he was 72 years old and the brother of Ira Wallace and that defendant is his son-in-law. Ray agreed with his brother that the road was built in 1932 and that it had only been used with permission from his father. On cross-examination, Ray admitted his uncle lived in the house located on the Martin property in the 1920's and that he used the road to get to that house at that time. Ray further testified that Lola Davis bought the house from his uncle and she continued to use the road as an access to her house although he stated she asked permission to use the road. Upon questioning from the trial court, Ray explained that he and his brother, when they said they built the road in 1932, meant that they extended the already existing lane down to their father's property.

Sandra See, defendant's wife, testified she has lived in her home for approximately 18 years. She testified she had observed the Wilsons' current farm tenant driving farm equipment across Sandy Branch Creek from the east to the west earlier that year. She recalled a conversation between defendant, Paul Henry Wilson, and Harold McConchie which occurred prior to the lawsuit being filed. She testified Paul Henry Wilson apologized for throwing defendant off his property and indicated he

wanted to use the road again and further indicated he would pay for any damages to the road. She stated Paul Henry Wilson acknowledged defendant's ownership of the road. Sandra recalled another conversation between her husband and Arthur and John Shotts during which they allegedly asked defendant for permission to use the road. This conversation occurred sometime just prior to the lawsuit being filed. On cross-examination, she admitted she was not an active participant in the conversation between defendant and Paul Henry Wilson and she believed it was merely an attempt to settle their differences regarding the use of the road. She also admitted she, herself, had never driven any vehicles across Sandy Branch Creek.

Defendant testified he had resided in his home since 1973 and had claimed ownership of the road since then. He stated only his friends, family and people to whom he gave permission were allowed to use the road. Defendant testified he had three separate conversations with Arthur Shotts during which Arthur asked for permission to use the road. According to defendant, he has had several conversations with William Henry Wilson and Paul Henry Wilson regarding permission to use the road. He claimed the first conversation occurred shortly after defendant acquired the property and William Henry Wilson asked for permission to use the road at that time. Sometime later, defendant refused to give William Henry Wilson permission to install a drainage ditch along the west side of the road, but did allow him to remove a fence row on that side of the road.

Apparently in the spring prior to the filing of this lawsuit, Paul Henry Wilson and defendant had an argument and Paul Henry Wilson told defendant to stay away from his property. In response, defendant told Paul Henry Wilson he could not use the road any longer. According to defendant, Paul Henry Wilson, along with Harold McConchie, came to defendant's house two weeks later, apologized and then asked for permission to use the road. Defendant testified Paul Henry Wilson offered to pay to use the road but defendant refused. Defendant then allegedly told Paul Henry Wilson he could use the road if he agreed that defendant owned the road and he (Wilson) would pay for any damage. Defendant testified Paul Henry Wilson agreed to those terms, used the road that fall to harvest his crops and then filed this lawsuit.

Finally, defendant testified the Wilsons had access to the eastern portion of their land by ways other than on his road. Defendant stated the Wilsons have access off the blacktop road that runs on the north side of their property, access from the southeast corner of their property, and access through land owned by Bob Whittaker. Defendant identified photographs he had taken which indicated there was access for

farm equipment near the bottom of a hill on the Wilson property in the southeast corner of their property, as well as access across Sandy Branch Creek.

Defendant admitted on cross-examination that he does not consider the Martins or the Wilsons to be good neighbors. Defendant explained that the alternate ways the Wilsons have access to their property would involve crossing over other people's land or Sandy Branch Creek.

Plaintiff presented two witnesses on rebuttal. First, Joe Williams testified he was the current tenant farmer for the Wilsons. He stated that although he crossed Sandy Branch Creek previously, he anticipated difficulty in crossing it with other larger farm equipment. On cross-examination, he testified other accesses to the Wilson land existed but they were less convenient and problematic for some farm equipment. Dean Martin, a plaintiff, testified he believed that David Nash owned a wedge-shaped piece of property between his property and the blacktop road.

The trial court issued its opinion through a letter dated August 5, 1991. The court found the 1891 partition suit divided 87.16 acres of the southeast fractional quarter, township 10 north, range 12 west, in Clark County. Urias Spittler was awarded the west two acres of the 87.16 acres plus the south 24.16 acres of the remaining 85.16 acres. The court further found the Martins became owners of the north 48 acres of the tract, while defendant became owner of the south 37 acres plus the two acres to the west which now constitute the road in dispute. The trial court concluded defendant held title to the road which was determined to be a private road. However, the trial court awarded plaintiffs implied easements by way of necessity because the two parcels of land were landlocked. The trial court noted, with respect to the Wilsons, the alternate means of access to the land would involve traversing a creek bottom or steep incline. Judgment was entered on October 1, 1991, and defendant filed this notice of appeal on October 7, 1991.

Easements are interest in land and can be created only by grant, by implication, or by prescription. (*Evanik v. Janus* (1983), 120 Ill. App. 3d 475, 484, 458 N.E.2d 962, 968.) As there was no grant in this case, plaintiffs could not have obtained an easement by grant. Likewise, as the use of the road was always permissive, plaintiffs could not claim an easement by prescription since permissive use negates the necessary element of adversity. Accordingly, plaintiffs could only have an easement, if at all, by implication.

■ There are two types of implied easements: the easement by necessity and the easement implied from a preexisting use. The easement by necessity usually arises when an owner of land conveys to another an

inner portion thereof, which is entirely surrounded by lands owned by either the grantor or the grantor plus strangers. Unless a contrary intent is manifested, the grantee is found to have a right-of-way across the retained land of the grantor for ingress to and egress from the landlocked parcel. (*Granite Properties Limited Partnership v. Manns* (1987), 117 Ill. 2d 425, 435-36, 512 N.E.2d 1230, 1236.) Whenever a conveyance by severance creates a situation where one parcel of land has no access to a public highway except over the remaining lands of the grantor or the lands of strangers, an easement over the remaining lands of the grantor is implied in the grant. (*Evanik*, 120 Ill. App. 3d at 487-88, 458 N.E.2d at 970.) Further, where such a situation exists, the easement need not be for continuous use but may lay dormant through successive grantees to be used at any time by a subsequent title holder. *Evanik*, 120 Ill. App. 3d at 488, 458 N.E.2d at 970.

While a showing of absolute necessity is not required in Illinois to create an implied easement of necessity upon the severance of land into two or more tracts, an easement by implication is not sanctioned if available alternatives affording reasonable means of ingress and egress exist. (*Rexroat v. Thorell* (1982), 89 Ill. 2d 221, 433 N.E.2d 235.) The burden of proof rests on the party seeking the easement to establish the elements necessary to raise an easement by implication. On review, a court will not disturb the findings of a trial court as to proof of the elements unless they are against the manifest weight of the evidence. *O'Hara v. Chicago Title & Trust Co.* (1983), 115 Ill. App. 3d 309, 317-18, 450 N.E.2d 1183, 1189.

### A. *The Martin Property*

Thus, in order to have an implied easement by way of necessity, the Martins had to have established unity of title in their land and defendant's land followed by a conveyance by severance, leaving them with no access to the public road.

First, plaintiffs' expert testified that in 1891 the Spittler family owned 87.19 acres in the southeast fractional corner of section 10 in Anderson Township, Clark County, and in that year the land was partitioned into six tracts. The person to whom the southern-most tract was conveyed also received two acres running along the west boundary of the whole tract. This partitioned tract is the land currently owned by the Martins and defendant. Accordingly, plaintiff established common ownership of the Martins' and defendant's properties and severance in 1891 of that property.

Second, the testimony presented by the Martins established that their property is landlocked. Their property is bordered on the east by

the land of a stranger, on the south by defendant's property, on the west by the road in question, and on the north, by the land of a stranger.

Dean Martin testified the public road had been altered such that it cut a corner off David Nash's property, which is immediately north of the Martin property. Thus, a wedge-shaped piece of property is found between the Martin property and the public road. Plaintiff's exhibit No. 11 was a warranty deed granting to David Ritter Nash and Sylvia Ritter Millhouse 18 acres of land just south of the public road except for a strip of land for an easement for construction by Anderson Township. Thus, a wedge of land exists between the Martin property and the public road, thereby giving the Martins no access to the public road without going over the land of strangers or on defendant's road. There is an irrigation ditch running between the Martin property and the public road that, if a tin culvert were installed, would provide access to the road. Defendant contends the Martins simply need to install the tin culvert over the ditch between the land and the public road.

In *People ex rel. Helgeson v. Hackler* (1961), 21 Ill. 2d 267, 171 N.E.2d 599, the supreme court held the plaintiff was entitled to an easement of necessity over the defendant's land. The plaintiff's land was landlocked by a drainage ditch and the land of strangers. She had previously used a road which went over the defendant's land and ran parallel to a drainage ditch for ingress and egress to her land. The defendant demanded money for the use of the road and the plaintiff thereafter sought to compel the drainage district to build a bridge across the ditch to afford her access to the public road. The supreme court stated:

> "It is well established that the law does not require a showing of absolute necessity to support the imposition of an easement by implication over the lands of others, but it is sufficient that such easements be reasonable, highly convenient and beneficial to the dominant estate." (*Helgeson*, 21 Ill. 2d at 271, 171 N.E.2d at 602.)

The court concluded the facts and circumstances of the case indicated these factors existed; thus, the plaintiff was awarded an easement and the drainage district was not required to build a bridge over the ditch.

In *Sheehan v. Sagona* (1958), 13 Ill. 2d 341, 148 N.E.2d 795, the plaintiffs and the defendants had a driveway along the property lines that divided their land. The defendant's property was immediately north of the plaintiff's property. The trial court granted an easement to the plaintiffs over part of the defendant's property and the supreme court affirmed, noting: "It is recognized in this regard that the claimed easement need not be really necessary for the enjoyment of the estate granted or retained but it is sufficient if it is highly convenient and ben-

eficial." (*Sheehan*, 13 Ill. 2d at 347, 148 N.E.2d at 798.) The court found the use of the driveway highly convenient and beneficial to plaintiffs. No other space was available for a driveway and the court further found that the use of a circular road over an unimproved alley or driveway in the rear of the premises, which was not dedicated to the public and not maintained or regularly used by others, did not provide adequate alternate facilities to defeat the easement. *Sheehan*, 13 Ill. 2d at 347-48, 148 N.E.2d at 798-99.

In *Granite Properties*, the supreme court affirmed the grant of an easement of necessity over a driveway on the defendant's property in the rear of a shopping center. Plaintiff sought permanent injunctive relief against the defendants' use of the driveway in the rear of a shopping center for deliveries. The court awarded the defendants an easement finding that the evidence established that the trailers would have to " ' "jockey around" ' " to turn around, causing four or five trucks to back up at one time. (*Granite Properties*, 117 Ill. 2d at 443, 512 N.E.2d at 1239.) The court went on to state that the evidence regarding the difficulty of making deliveries to the front of the shopping center was sufficient to demonstrate the unreasonableness of such alternative measures, despite the plaintiff's failure to establish the precise cost of reconstructing the shopping center for its own purpose. *Granite Properties*, 117 Ill. 2d at 443, 512 N.E.2d at 1239; see also *Koehler v. Price* (1990), 204 Ill. App. 3d 845, 562 N.E.2d 370; *Miller v. Schmitz* (1980), 80 Ill. App. 3d 911, 400 N.E.2d 488; *Finn v. Williams* (1941), 376 Ill. 95, 33 N.E.2d 226.

Thus, the Martins are entitled to an easement by way of necessity if the easement is reasonable, highly beneficial and convenient for the enjoyment of their property. The Martins established that they need to use defendant's road to gain access to their land from the public road. It is unreasonable to require them to install a tin culvert over the irrigation ditch over the land of a stranger when defendant's road already exists. Moreover, the Martins need access to the land for their farm equipment and the road is well suited for that purpose. Therefore, we hold the trial court's decision to grant the Martins an implied easement by way of necessity was not against the manifest weight of the evidence.

### B. *The Wilson Property*

◼ Plaintiffs' expert testified Frank Cole once owned both the land now owned by the Wilsons as well as that owned by defendant. In March 1958, the heirs of Frank Cole conveyed what is now defendant's property and the road in question to Herman and Ida Wallace, who later conveyed it to defendant. In April 1958, the Cole heirs conveyed the

Wilson property to the Wilsons. Thus, there may have been common ownership of the two tracts of land; however, the land was never one parcel which was severed leaving one tract landlocked. Unlike the 1891 partition suit of the Martin property and defendant's property, the Wilson property and defendant's property never shared unity of title followed by a separation. Accordingly, the Wilsons could not have an implied easement, as the first requirement is missing.

Nevertheless, the Wilsons are not without recourse. A license in respect to real property is permission to do an act or series of acts upon the land of another without possessing any estate or interest in such land. Permission to use land cannot ripen into a prescriptive right, regardless of the time such permissive use is enjoyed. (*Mueller v. Keller* (1960), 18 Ill. 2d 334, 340, 164 N.E.2d 28, 32.) A parol license is revocable, although a consideration has been paid or expenditures have been made on the faith of the agreement. (*Lang v. Dupuis* (1943), 382 Ill. 101, 106, 46 N.E.2d 21, 24.) Unless the evidence is clearly to the contrary, the court will presume that a parol agreement to impress property with the servitude was made with the knowledge of the provisions of the Statute of Frauds, and was therefore intended as a license only and not as an easement or other interest in the land itself. *Petersen v. Corrubia* (1961), 21 Ill. 2d 525, 532, 173 N.E.2d 499, 502-03.

A license is not an interest in land, but only a revocable privilege to go upon the land for a specified purpose. (*Keck v. Scharf* (1980), 80 Ill. App. 3d 832, 835, 400 N.E.2d 503, 505.) It is in the nature and definition of a license that it is revocable at the will of the licensor. A verbal license, such as the one in the present case, may be revoked by express notice, by acts which are entirely inconsistent with the enjoyment of the use, or by appropriating the land in question to any use contrary to its enjoyment by the licensee. (*Keck*, 80 Ill. App. 3d at 836, 400 N.E.2d at 506.) Courts of equity will restrain the exercise of the legal right to revoke a license when the conduct of the licensor has been such that the assertion of the legal title would operate as a fraud upon the licensee. *Robinson v. Robinson* (1981), 100 Ill. App. 3d 437, 446, 429 N.E.2d 183, 189.

Defendant granted the Wilsons a license to use the road by giving them permission to use it. This license is revocable by defendant unless to allow its revocation would operate as a fraud upon the Wilsons.

In *Mercer v. Sturm* (1973), 10 Ill. App. 3d 65, 293 N.E.2d 457, the court held the license was irrevocable because to allow the licensor to revoke would operate as a fraud on the licensee. There, the plaintiffs were granted a license over a lane on part of the defendant's property to gain access to a house they intended to build. The plaintiffs extended

the lane 200 feet, smoothed, graded, graveled and installed a culvert on the driveway. They also built a garage that could be reached only by this driveway. The court held that the license was irrevocable because to otherwise hold, the plaintiffs would be denied access to their garage and the defendant had not said anything about revoking the license while he watched the garage being built.

Here, to allow defendant to revoke the license to use the road would act as a fraud upon the Wilsons. If the license to use the land is revoked, they cannot get their farm equipment onto the eastern portion of their land.

The eastern portion of their property may be accessible by crossing Sandy Branch Creek; however, Paul Henry Wilson testified that Sandy Branch Creek is a quicksand stream and the only way they were able to cross it was to add gravel and cut down the banks of the creek. Even so, they still had a truck and tractor get stuck in the creek. Access to this part of the land may be had through the southeast corner of the land. However, evidence was presented to show that a large hill exists in this part of the Wilson property making it extremely difficult to maneuver various items of farm equipment onto the land. John Boyer testified that for farming purposes, other than the road in question, the Wilsons have no access to the eastern portion of their land. Harold McConchie testified that the access on the southeast corner of the Wilson land was at the top of a large hill and was too narrow for certain farming equipment.

Hence, there are other means of access to the eastern part of the Wilson property. However, these means of access are not convenient and present difficulties with respect to the use of the farm equipment. Either the Wilsons must cross Sandy Branch Creek and risk getting their equipment stuck, or they must negotiate a large hill on the southeast corner of their property which also goes over the land of a stranger. To require them to take such a risk would operate as a fraud upon the Wilsons. Without the use of defendant's road, the Wilsons are denied access to the eastern portion of their land, rendering the land useless. Defendant was aware of this when he revoked the permission to use the road. Therefore, we find the Wilsons are entitled to an irrevocable license to use defendant's road because to allow defendant to revoke the license would operate as a fraud upon the Wilsons.

In conclusion, we hold the trial court's order granting the Martins an implied easement by way of necessity was not against the manifest weight of the evidence. However, the trial court's order granting the Wilsons an implied easement by way of necessity was against the manifest weight of the evidence. Nevertheless, we conclude that the Wilsons

are entitled to an irrevocable license to the use of defendant's road. Since a reviewing court may consider whether the judgment is justified for any reason or ground appearing of record (*City of Marshall v. City of Casey* (1989), 177 Ill. App. 3d 1065, 532 N.E.2d 1121), we affirm the trial court.

Affirmed.

STEIGMANN and COOK, JJ., concur.

## APPENDIX