In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2970

GERALD DIX,

*Plaintiff-Appellant,*

*v.*

EDELMAN FINANCIAL SERVICES, LLC,* *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cv-6561 — **Charles R. Norgle**, *Judge.*

ARGUED SEPTEMBER 17, 2020 — DECIDED OCTOBER 19, 2020

Before KANNE and HAMILTON, *Circuit Judges.***

PER CURIAM. Gerald Dix alleges that he was unlawfully evicted. But unlike most wrongful-eviction plaintiffs, Dix

---

* Despite being the first-named defendant, Edelman is virtually irrelevant to this appeal for reasons made apparent in this opinion.

** Circuit Judge Barrett was a member of the panel when this case was submitted but did not participate in the decision and judgment. The appeal is resolved by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

filed a sprawling *pro se* complaint in federal court asserting nineteen claims against almost as many defendants. The claims included a hodgepodge of state and federal causes of action. The defendants included Dix's alleged romantic-interest-turned-landlady Theresa Miller, Miller's real estate broker and financial advisor, a handful of police officers, two municipalities, the local car-towing company, and a few John and Jane Does for good measure.

The experienced district judge dismissed Dix's complaint for failure to state a claim. On appeal, we have focused on just one cause of action—Dix's Fourth Amendment claim against a subset of the defendants—because the others are wholly frivolous. We conclude that Dix's allegations as to that claim, like the rest, do not state a claim for relief, so we affirm the district court.

## I. BACKGROUND

These facts are drawn from Dix's amended complaint and—with notable exceptions explained in this opinion—are assumed to be true for purposes of this appeal. *Gomez v. Randle*, 680 F.3d 859, 861 (7th Cir. 2012). We have weeded out the bulk of Dix's allegations and concentrate only on those pertinent to his Fourth Amendment claim.

Gerald Dix lived with Theresa Miller in her home in Lisle, Illinois, for nearly six years. Their relationship had once been romantic, but somewhere along the way it morphed into what Dix describes as a platonic "landlord-tenant" arrangement, albeit without a term or payment of rent. Dix would share living expenses with Miller and perform household chores. For her part, Miller would provide Dix with living space in her basement. But she also did all the things that no good

landlady would do—"badger and harass" Dix for more money; force him to make repairs and do onerous tasks, such as serving her meals in bed; rummage through his mail and possessions; use his credit cards; clutter up every corner of the house; and keep the home in a "barely habitable" condition.

In 2017, Miller decided to sell her house and was advised by her realtor, Cheryl Shurtz, to "stage" it for prospective buyers. Miller told Dix to move out so she could prepare the house to be staged. He refused, so Miller called the police. Four or five officers responded and told Miller that she could not evict Dix without an order of the court. Undeterred, she called the police again the next day. This time, Officers Rob Sommer and Sean McKay arrived.

Officers Sommer and McKay allegedly knew that there had been no domestic disturbance and that Miller had been told she couldn't remove Dix from her house without a court order. But they agreed to help Miller evict Dix anyway. The officers prevented Dix from entering the house while Miller and an unknown associate ("a lazy elderly woman") hauled Dix's things outside and deposited them on the driveway. Dix protested, suspecting that Miller was stealing or destroying his property. And as he watched Miller and her helper carelessly handling his possessions, Dix started hurling insults and called Miller's associate "stupid." Officer Sommer warned Dix not to call anyone "stupid" (or "a dingbat, ding-a-ling, idiot or 'stupid b—'") and threatened to arrest him for disorderly conduct. Dix held his tongue, but not before asserting his right to call anybody "any proper or slang term that he deemed necessary."

Eventually, and in part because Miller and her "lazy" associate couldn't finish the job themselves, Dix relented and

agreed to vacate the house. He left to get a moving van, and when he returned, the officers allowed him into the home to retrieve his property but physically refused him access to certain rooms. After Dix gathered his things, Officer Sommer ordered him to hand over his keys to the house. Dix complied, and the officers told Dix not to return except to fetch his Dodge truck that still sat in the driveway.

In short order, Dix filed his initial complaint, *pro se*, in federal court. He asserted twelve causes of action against nine defendants. The district court struck the pleading as "replete with redundant, impertinent, and scandalous allegations." The court permitted Dix to amend his complaint but warned that "frivolity may result in sanctions."

Dix took up the offer to amend his complaint—but instead of improving it, he added seven causes of action, five defendants, and sixty-nine paragraphs of allegations. Among his nineteen claims was a federal cause of action under 42 U.S.C. § 1983 against Miller, Shurtz, and Officers Sommer and McKay for violating, and conspiring to violate, Dix's Fourth Amendment rights. He sought not less than $1,095,000 in compensatory and punitive damages, plus costs, attorney fees, and preliminary and permanent injunctive relief.

The district court dismissed all of Dix's claims with prejudice. Among other things, the court concluded that Dix did not adequately allege a Fourth Amendment violation because he was free to leave at any time and a potentially unlawful eviction under state law does not implicate the Fourth Amendment.

Dix appealed, again acting *pro se*. After reviewing Dix's opening brief, we decided that he would benefit from

appointed counsel on appeal. Dix refused counsel, so we appointed an *amicus curiae* instead. We instructed the *amicus* to focus on the only one of Dix's nineteen claims that we felt was not completely frivolous—the Fourth Amendment claim.[1]

## II. ANALYSIS

"We review a 12(b)(6) dismissal *de novo* and construe all allegations and any reasonable inferences in the light most favorable to the plaintiff. And while a complaint does not need 'detailed factual allegations' to survive a 12(b)(6) motion to dismiss, it must allege sufficient facts 'to state a claim to relief that is plausible on its face.'" *League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 724 (7th Cir. 2014) (citation omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (citing *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007)). Although "we accept the well-pleaded facts in the complaint as true, legal conclusions and conclusory allegations … are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)). And "we may affirm a dismissal on any ground supported by the record." *Kowalski v. Boliker*, 893 F.3d 987, 994 (7th Cir. 2018) (citing *Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*, 837 F.3d 736, 740

---

[1] In our June 19, 2019 order, we stated: "After reviewing the wide range of claims alleged and argued by Dix, the court encourages counsel to focus attention on the Fourth Amendment claims against Officers Sommer and McKay, and against Miller and Edelman Financial Services." Miller rightly pointed out that Dix's Fourth Amendment claim was asserted against Officers Sommer and McKay, Miller, and *Shurtz* (not Edelman). In any event, the *amicus* appropriately opted to tailor his argument to focus only on Miller and Officers Sommer and McKay.

(7th Cir. 2016); *Giffin v. Summerlin*, 78 F.3d 1227, 1230 (7th Cir. 1995)).

The Fourth Amendment states, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches or seizures, shall not be violated." U.S. Const., amend. IX.

Dix contends on appeal that the district court should not have dismissed his Fourth Amendment claim brought under 42 U.S.C. § 1983 because (1) he alleged that his removal from Miller's home was a Fourth Amendment seizure; (2) he alleged that that seizure was unreasonable; (3) he alleged a conspiracy between the officers and Miller to violate his Fourth Amendment rights; and (4) the officers are not entitled to qualified immunity. We take these in turn.

### A. Dix Did Not Allege a Fourth Amendment Seizure.

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *accord Segura v. United States*, 468 U.S. 796, 806 (1984) ("A seizure affects only the person's possessory interests; a search affects a person's privacy interests."); *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012) ("[T]he critical question relates to any possessory interest in the seized object, not to privacy or liberty interests."). So the first issue—whether Dix alleged that he suffered a "seizure" within the meaning of the Fourth Amendment—turns on whether he

alleged facts sufficient to support the inference that he had some possessory interest in Miller's home.[2]

Dix argues that he adequately alleged a possessory interest in Miller's home because he refers to himself as Miller's "tenant" and alleges that they "had an oral contract for their landlord-tenant relationship." If that were true, then Dix may have alleged a protected interest in the property, and the officers may have infringed on his right "to retreat into his own home," which stands "[a]t the very core" of the Fourth Amendment. *Silverman v. United States*, 365 U.S. 505, 511 (1961). Indeed, the Supreme Court has explained that under the Fourth Amendment, "the right against unreasonable seizures would be no less transgressed if the seizure of [a] house was undertaken to collect evidence, verify compliance with a housing regulation, *effect an eviction by the police*, or on a whim, for no reason at all." *Soldal v. Cook Cnty.*, 506 U.S. 56, 69 (1992) (emphasis added). Succinctly stated by another court, the "[f]orcible eviction of tenants … is by its very nature a meaningful interference with their possessory interests." *Thomas v. Cohen*, 304 F.3d 563, 573 (6th Cir. 2002).

---

[2] The district court dismissed Dix's Fourth Amendment claim on a different basis. The court concluded that Dix premised the claim entirely on his contention "that he was 'wrongfully' evicted in violation of the Illinois Forcible Entry and Detainer Act, 735 Ill. Comp. Stat. 5/9-101, *et seq.*," and because the "mere violation of a state statute does not infringe the federal Constitution," the claim must fail. *Snowden v. Hughes*, 321 U.S. 1, 11 (1944); *see also Gordon v. Degelmann*, 29 F.3d 295, 301 (7th Cir. 1994) (holding that an officer's failure to comply with the Illinois Forcible Entry and Detainer Act "does not matter" for purposes of a Fourth Amendment claim). We do not opine on this holding and instead exercise our authority to affirm the district court on alternative grounds that are apparent in the record and argued on appeal. *Kowalski*, 893 F.3d at 994.

But Dix's argument runs into a couple of problems. The first is that the existence of a landlord-tenant relationship is a legal conclusion that we can reject at the motion to dismiss stage. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *Grange Mut. Cas. Co. v. Slaughter*, 958 F.3d 1050, 1055 (11th Cir. 2020) (holding that an affirmation that "an enforceable lease existed" is "only a legal conclusion"); *In re United Cigar Stores Co. of Am.*, 89 F.2d 3, 5 (2d Cir. 1937) ("[T]he facts do not justify the legal conclusion that … the relations of the parties were those of landlord and tenant."). So Dix's naked allegation that he "enjoyed the legal status and interest of a full-fledged tenant … is a self-generated legal conclusion to which this Court owes no deference." *Snyder v. Daugherty*, 899 F. Supp. 2d 391, 407 (W.D. Pa. 2012).

The second problem for Dix is that the rest of his allegations actively undermine his conclusory assertion that he was a tenant and therefore had a possessory right to Miller's home protected under the Fourth Amendment. *Jacobsen*, 466 U.S. at 113.

Under Illinois law, there are leases and there are licenses. A lease creates in the tenant a legal "interest … in the premises" and "right to possession." *Jones v. Kilfether*, 139 N.E.2d 801, 803 (Ill. App. 1956). "[T]he essential elements of a lease include: (1) the extent and bounds of the property; (2) the term of the lease; (3) the amount of rent; and (4) the time and manner of payment. If any of these elements are missing, a lease has not been created … ." *Millennium Park Joint Venture, LLC v. Houlihan*, 948 N.E.2d 1, 19 (Ill. 2010) (citing *Lannon v. Lamps*, 368 N.E.2d 196, 199 (Ill. App. 1977)). The ultimate hallmark of a lease is the tenant's "exclusive possession of the premises

against all the world, including the owner." *Id.* at 18 (quoting 53 C.J.S. *Licenses* § 133 (2005)).

A license, on the other hand, "merely confers a privilege to occupy the premises under the owner." *Id.* (quoting 53 C.J.S. *Licenses* § 133 (2005)). Unlike a lease, a license is "ordinarily revocable at the will of the grantor," *id.* at 19 (citing *Jackson Park Yacht Club v. Ill. Dep't of Local Gov't Affairs*, 417 N.E.2d 1039, 1043 (Ill. App. 1981)), and "is not an interest in land," *Martin v. See*, 598 N.E.2d 321, 330 (Ill. App. 1992) (citing *Keck v. Scharf*, 400 N.E.2d 503, 505 (Ill. App. 1980)); *see also Robinson v. Robinson*, 429 N.E.2d 183, 189 (Ill. App. 1981) ("[A] possessory interest … precludes application of a license theory."); *Application of Rosewell*, 387 N.E.2d 866, 870 (Ill. App. 1979) (a license does not "transfer[] a possessory interest"). Moreover, a license "cannot ripen into a prescriptive right, regardless of the time such permissive use is enjoyed." *Keck*, 400 N.E.2d at 505. Licensees can include anyone from a casual social guest, *Pashinian v. Haritonoff*, 410 N.E.2d 21, 21 (Ill. 1980), to a teenager living with her parents, *Meyn v. Seidel*, No. 2-09-1293, 2011 WL 10108515, at *5 (Ill. App. Mar. 22, 2011), to a homeowner's spouse, *Jones*, 139 N.E.2d at 804.

Turning to Dix's amended complaint, we find none of the characteristics of a lease or tenancy under Illinois law. Dix alleges in excruciating detail how he had virtually no possession or control over any part of the home—he had no ability to prevent Miller from going through his things, opening his mail, mingling her property with his, or storing her personal items in every corner of the house ("with the exception of one drawer in a small nightstand"). He kept his own stuff in "banker boxes, plastic tubs and overnight bags" and had so little privacy in the home that he resorted to locking his

possessions in his truck. And he never mentions the word "rent." Only one reasonable inference can be drawn from these allegations: that Miller maintained complete possession and control over her home but granted Dix a revocable license to stay there.[3]

What's more, as Dix's amended complaint makes abundantly clear, Miller revoked Dix's license. "A verbal license, such as the one in the present case, may be revoked by express notice, by acts which are entirely inconsistent with enjoyment of the use, or by appropriating the land in question to any use contrary to its enjoyment by the licensee." *Keck*, 400 N.E.2d at 506. Miller demanded that Dix leave—about as clear a revocation as one could expect.[4]

And when a license is revoked, the licensee becomes a trespasser. *See JCRE Holdings, LLC v. GLK Land Tr.*, 136 N.E.3d 202, 205 (Ill. App. 2019) ("[U]pon termination of a license, the licensee's failure to remove its property from the licensor's land constitutes a trespass."); *cf. People v. Brown*, 501 N.E.2d 1347 (Ill. App. 1986) (affirming trespass conviction of live-in boyfriend who entered home after his license was revoked).

---

[3] Compare Dix's allegations to *Gustin v. Barney*, 250 Ill. App. 209, 213 (1928), in which the court found that an agreement was a lease where "[i]t provide[d] for the payment of a certain fixed rent at definite periods. The use granted was for a definite term with privilege of renewal. It was exclusive as to that use and did not merely confer a privilege under the owner."

[4] The *amicus* suggests that if Dix had a license, it may have been irrevocable. This argument has been underdeveloped, so we will not consider it—and it's probably meritless, anyway. *See Keck*, 400 N.E.2d at 506 (explaining the narrow circumstances under which a license becomes irrevocable).

"[A] trespasser's wrongful presence forestalls a Fourth Amendment challenge." *United States v. Sawyer*, 929 F.3d 497, 500 (7th Cir. 2019) (citing *United States v. Battle*, 637 F.3d 44, 49 (1st Cir. 2011) (defendant who overstayed his visit became a trespasser with no "legally sufficient interest in the apartment to mount a Fourth Amendment challenge"); *United States v. Struckman*, 603 F.3d 731, 747 (9th Cir. 2010) ("[H]ad Struckman been an actual trespasser, he would not be able to claim the protections of the Fourth Amendment."); *United States v. Hunyady*, 409 F.3d 297, 303 (6th Cir. 2005)).[5]

In short, by the time Officers Sommer and McKay arrived, Dix had no right or privilege to be in Miller's home whatsoever. He therefore could not have had a "possessory interest" in it. "A seizure of property occurs when there is 'some meaningful interference with an individual's possessory interests in that property,' and here there was none." *United States v. Jones*, 565 U.S. 400, 419 (2012) (Alito, J., concurring) (quoting *Jacobsen*, 466 U.S. at 113). So Dix does not sufficiently allege a seizure within the meaning of the Fourth Amendment.[6]

---

[5] These cases concerned searches, not seizures, but their conclusions carry over to this case. Just as a trespasser has no reasonable expectation of privacy in the property, a trespasser also lacks a possessory interest in the property. The very definition of "trespass," after all, is the interference of *another's* possessory interest. *See Skinner v. Mahomet Seymour Sch. Dist. No. 3*, 413 N.E.2d 507, 510 (Ill. App. 1980) ("[T]respass requires a wrongful interference with the actual possessory interest in property.").

[6] We recognize that, in some circumstances, a houseguest (undoubtedly a licensee) may have a reasonable expectation of privacy in his host's home "rooted in 'understandings that are recognized and permitted by society.'" *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978)). But this is a seizure case, not a search case, so "the critical question relates to any possessory interest in the

*B. Dix Did Not Allege that Any Seizure Was Unreasonable.*

Even if Dix alleged that there was a Fourth Amendment "seizure," to "state a constitutional violation," he must also allege that "the seizure … was 'unreasonable.'" *White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002). Case law compels our next conclusion: that even if a seizure occurred here, it was reasonable.

In *White*, a police officer was called to a home in response to an apparent domestic dispute. *Id.* at 991. When he arrived, heated words as well as objects were flying between the non-resident homeowner, Witcher, and her nephew, White, who lived in Witcher's home. *Id.* at 991–92. Witcher had ignited the dispute when she told White that she wanted him out. *Id.* So the officer "was forced to ask either Witcher, the admitted nonresident homeowner, or White, her relative and resident guest, to leave the premises." *Id.* at 996. We held that "White's allegations of a right to remain on Witcher's property, in the face of her demand that he leave, [were] tenuous at best," and "[b]ased on this unique situation, it could not have been unreasonable for [the officer] to request White, the family

---

seized object, not to privacy or liberty interests." *Burgard*, 675 F.3d at 1033. Besides, this is not one of those circumstances contemplated in *Olson*. A houseguest "is there with the permission of his host, who is willing to share his house and his privacy with his guest." 495 U.S. at 99. In that instance, "[i]t is unlikely that the guest will be confined to a restricted area of the house[, and] hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises." *Id.* But a trespasser is no houseguest, and any reasonable person would recoil at the notion that a trespasser has a protected privacy interest—let alone a possessory interest—in another person's home.

member with the apparently inferior property interest in re-
maining on the premises, to vacate the explosive situation."
*Id.*

Dix contends that this case is nothing like *White* because
here, there was no domestic disturbance and, as a tenant, he
had more than a "tenuous" right to be in the home. We have
already rejected his claimed tenancy, so his "right to remain
on [Miller's] property, in the face of her demand that he
leave," was truly "tenuous at best." *Id.*

We likewise reject Dix's conclusory allegation that there
was no domestic disturbance. Miller had to call the police—
not once, but twice—to remove a man from her home whom
she had previously let live there but who now refused to
leave. When Officers Sommer and McKay arrived, Dix was
upset enough with Miller and her "lazy" accomplice for how
they were removing his property from the home to begin
hurling epithets at them in the officers' presence. In the apt
words of Dix's amended complaint, "the situation became de-
ranged." His allegation that there was no domestic disturb-
ance, then, is not only an "unsupported conclusion[] of fact"
but implausible on its face. *Hickey v. O'Bannon*, 287 F.3d 656,
658 (7th Cir. 2002).

In some ways, this case is even clearer than *White*. Unlike
the defendant there—a "nonresident homeowner" and family
member of the plaintiff—the defendant here was the *resident*
homeowner who lived under the same roof as the (unrelated)
man she wanted removed. It was entirely reasonable for the
officers to separate two quarreling cohabitants by removing,
at the homeowner's request, the one with the obviously infe-
rior—indeed, non-existent—property interest. *White,* 310 F.3d
at 996. This comfortably qualifies as one of those instances in

which "police officers may, as part of their community care-taking function, separate parties to a domestic disturbance by ordering one party to leave the premises," and "the officers' decision to order [Dix] to leave the house was reasonable since he appeared to have the inferior possessory interest in the property." *Lunini v. Grayeb*, 184 F. App'x 559, 562 (7th Cir. 2006) (following *White*, 310 F.3d at 996). What, we wonder, was the more reasonable thing for these officers to have done? Leave the scene and let Miller and Dix duke it out between themselves? No case supports such an argument.[7]

In addition, the (apparently erroneous) legal advice that Miller received from other officers the day prior—that she needed a court order to evict Dix—does not make the conduct of Officers Sommer and McKay any less reasonable considering the acrimonious circumstances alleged. To be sure, Dix does allege that Officers Sommer and McKay knew of that previous conversation. But an officer's "decision [i]s not unreasonable even if it [i]s shown at a later time that the officer reached an incorrect conclusion." *Id.* Even if Officers Sommer and McKay were "incorrect" in their decision to remove Dix "when all of the facts were clear, … a police officer cannot be expected to make that determination when [two cohabitants] are shouting at each other. Nor was it unreasonable to use the threat of arrest to accomplish this goal." *White*, 310 F.3d at 996. To the contrary, it was well within "the scope of [the officers']

---

[7] It's worth noting that Dix also alleges, albeit in a later portion of his forty-four-page amended complaint, that Miller threatened to kill him and that he reasonably feared for his safety. This allegation only sheds more light on their apparently caustic relationship and makes it even easier for us to conclude that the relevant portions of Dix's amended complaint paint the picture of a domestic disturbance.

community caretaking function" given the fracas unfolding around them. *Lunini*, 184 F. App'x at 562.

We conclude that if there were a seizure, it was reasonable.

*C.  Dix Did Not Allege a Conspiracy Under 42 U.S.C. § 1983.*

The above discussion compels us to reject Dix's third argument that he adequately alleged a conspiracy between the officers and Miller to deprive him of his Fourth Amendment rights.

"To establish Section 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1016 (7th Cir. 2000) (quoting *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998)). Moreover, "a plaintiff must allege and prove both a conspiracy and an actual deprivation of rights; mere proof of a conspiracy is insufficient to establish a section 1983 claim." *Hampton v. Hanrahan*, 600 F.2d 600, 622 (7th Cir. 1979), *cert. granted in part, judgment rev'd in part on other grounds*, 446 U.S. 754 (1980).

As we have seen, Dix did not allege an actual deprivation of rights because there was no Fourth Amendment seizure. And Dix "cannot establish that defendants conspired to violate his Fourth Amendment right because, even if the officers 'seized' [Dix's property] when they ordered him to leave [Miller's home], they did so lawfully. 'A person may not be prosecuted for conspiring to commit an act that he may perform with impunity.'" *Lunini*, 184 F. App'x at 563 (quoting *House v. Belford*, 956 F.2d 711, 720 (7th Cir. 1992)).

*D.  The Officers Are Entitled to Qualified Immunity.*

And so we come to the final issue of qualified immunity. "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014)). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it,' meaning that 'existing precedent placed the statutory or constitutional question beyond debate.'" *Id.* (alterations and citations omitted) (first quoting *Plumhoff*, 572 U.S. at 778; then quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Though it matters little now, even if the officers' actions were unlawful, they would be entitled to qualified immunity. Our most analogous case makes that clear enough. *White*, 310 F.3d at 997 ("[B]ecause the eviction was not unreasonable under these circumstances, the district court correctly granted [the officers] qualified immunity."); *see also Spiegel v. City of Chicago*, 106 F.3d 209, 210 (7th Cir. 1997) (holding that a former resident's "right not to have the police prevent him from entering an apartment that was in the possession of the landlord was not clearly established at the time the police blocked his attempt to enter").

One other case, *Higgins v. Penobscot Cnty. Sheriff's Dep't*, is worth discussion. 446 F.3d 11 (1st Cir. 2006). The plaintiff there, Higgins, awoke one morning, donned his robe, and poured himself a cup of coffee. *Id.* at 12. Peaceful though it sounds, he happened to be in an apartment that was the subject of a hotly contested familial squabble—so when Higgins's sister came upon Higgins and his coffee, she called the police. *Id.* By the time the officer arrived, the whole family had converged in a "screaming contest." *Id.* Higgins insisted to the officer that he had a right to reside there. *Id.* The officer didn't buy it, issued Higgins a trespass citation, gave him a few minutes to gather his things, and threated him with arrest "if he did not leave or returned to the property." *Id.* at 13.

Higgins sued the officer, but the court held that the officer was entitled to qualified immunity. *Id.* at 14–15. Among the facts supporting this conclusion were that the officer "encountered a volatile and potentially dangerous situation—described by Higgins himself as a 'screaming contest'—when he arrived"; "[t]he subject of the dispute was a man who … claimed a right to occupy a building," but the man "provided no written lease or other documentation to support his claimed occupancy right[ and] only made a conclusory verbal claim of entitlement"; and "[o]pposing this man were several members of his own family, all of whom disputed his claimed entitlement." *Id.* at 14.

Add that case to our own, and it's clear that, to the extent existing case law put the officers on notice of anything, it was that they were *not* violating the Constitution by removing a quarreling cohabitant at the request of the homeowner in these circumstances.

The cases that Dix relies on, on the other hand, are simply too different in too many ways to have clearly established that these officers' conduct, in these circumstances, was unlawful. Dix primarily relies on *Soldal*, 506 U.S. 56. But there, the evicted persons were not mere licensees (let alone trespassers) and the Court did not determine whether the seizure was reasonable under the circumstances. *See Hurem v. Tavares*, 793 F.3d 742, 747 (7th Cir. 2015) ("In *Soldal*, the Supreme Court did not reach the question whether the removal of the mobile home was unreasonable."). Perhaps most important, the officers "assisted in a forcible eviction that was *patently unlawful*." *Cofield v. Randolph Cnty. Comm'n*, 90 F.3d 468, 471 (11th Cir. 1996) (emphasis added) (citing *Soldal*, 506 U.S. at 56–60).

And in Dix's other case, *Thomas*, the plaintiff (a tenant) had a clear possessory interest in the property and did not live with the homeowner, there were no exigent circumstances warranting removal, and the court found that the officers *were* entitled to qualified immunity. 304 F.3d at 566, 567; *id.* at 583 (Gilman., J. concurring) ("[A] reasonable person in the officers' position would not have known that the eviction in question violated the plaintiffs' Fourth Amendment right[s].").

Neither *Soldal* nor *Thomas* clearly established that the officers' conduct here violated Dix's constitutional rights. Dix's "argument essentially invites us to hold, as a matter of constitutional law, that a police officer, summoned to mediate a volatile dispute involving an alleged trespasser, is obliged to leave the situation unresolved simply because the trespasser represents himself to be entitled to be there. To state the proposition is to expose its foolishness." *Higgins*, 446 F.3d at 15.

\* \* \*

For all the above reasons, we conclude that Dix's Fourth Amendment claim against Miller and Officers Sommer and McKay was properly dismissed. We do not need to address Dix's many other claims against the many other defendants because they are entirely without merit.[8]

But there is another matter that we must address. Gerald Dix is no stranger to this court or any other level of the federal judiciary. He has a twenty-year history of filing patently frivolous lawsuits and appeals—and being admonished for doing so. *E.g.*, *Dix v. Unknown TSA Agent No. 1*, 588 F. App'x 499, 499 (7th Cir. 2015) ("Because Dix has filed two frivolous appeals within the last few months, we warn him that further frivolous appeals may result in sanctions."), *cert. denied*, 576 U.S. 1057 (2015); *Dix v. Illinois*, 202 F.3d 272, *2 (7th Cir. 1999) (unpublished disposition) (noting that Dix's case had "absolutely no foundation"); *Dix v. United States*, No. 09-CV-6349,

---

[8] If any of Dix's other claims are worth mentioning, it's his claim that Officer Sommer and the Village of Lisle infringed his First Amendment right to free speech when Officer Sommer threatened to arrest Dix if he did not stop cursing at Miller and her associate. Dix relies primarily on *Purtell v. Mason*, 527 F.3d 615 (7th Cir. 2008), which rejected application of the fighting-words doctrine where the plaintiff erected mock tombstones in his yard that insulted the neighbors. But that case is easily distinguishable, as the protected speech there occurred on the plaintiff's own property, whereas Dix cast his insults from *Miller's* property, where he was not entitled to be. So we agree with the district court's conclusion that "Sommer's warning to Plaintiff that he would be arrested should he continue his course of conduct did not violate Plaintiff's First Amendment right to free speech, because Plaintiff had no right to hurl abusive insults at Miller and Doe #2 during an ongoing domestic dispute at Miller's home." *See Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("[W]e have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.").

2010 WL 2607262, *14 (N.D. Ill. June 24, 2010) (warning Dix of "potential sanctions"); *see also Dix v. Clancy*, 136 S. Ct. 45 (2015) (denying petition for writ of certiorari), *rehearing denied*, 136 S. Ct. 45 (2015).

Apparently, Dix long ago decided that his every perceived grievance, no matter how "paranoid and delusional," should be aired in the federal courts. *Unknown TSA Agent No. 1*, 588 F. App'x at 499. In this case, Dix got lucky enough to include one claim that was not completely absurd; throw nineteen claims at the wall, and one of them just might stick. But the common thread running through all of Dix's litigations is that they are stunningly devoid of merit. Not only that, but his court filings—in this case and others—are replete with intemperate, inflammatory, and downright offensive language.

Notably, the day after Dix filed this appeal, the Northern District of Illinois explained in an executive committee order that "[s]ince July 28, 2008, *pro se* litigant Gerald Dix has filed six cases in this court. The cases have all been dismissed for reasons such as remand denied, failure to state a federal claim, and filing a frivolous complaint." Executive Committee Order at 1, *In re: Gerald Dix*, 1:18-cv-06252 (N.D. Ill. Sept. 13, 2018), ECF No. 1. Worse yet, "Dix caused a disturbance in a courtroom of the Dirksen U.S. Courthouse … , becoming verbally and physically combative and disrupting the judge's court." *Id.* Unsurprisingly, "Dix's inappropriate conduct has raised concerns among the Court, the Clerk's Office, and the United States Marshals Service." *Id.* The district court determined that "reasonable and necessary restraints must be imposed upon Mr. Dix's ability to file new civil cases in this district *pro se*." *Id.* The court enjoined Dix's ability to file any new civil cases in that district unless he follows procedures to

obtain leave of court and entered several other restrictions on Dix's capacity to abuse the legal process. *Id.* at 1–3.

Rightly so, but we find we must go further. Without a doubt, Dix "has abused the judicial process with frivolous litigation. The result has been the harassment of opposing parties, insult to judicial officers, and waste of limited and valuable judicial resources … . When dealing with a frivolous litigator who, despite due warning or the imposition of sanctions, continues to waste judicial resources, we impose a filing bar preventing the litigant from filing in this court or any federal court in this circuit." *McCready v. eBay, Inc.*, 453 F.3d 882, 892 (7th Cir. 2006).

Dix has had ample warning. We therefore "direct the clerks of all federal courts in the circuit to return unfiled any papers that [Dix] attempts to file" for two years from the date of this opinion. *Support Sys. Int'l, Inc. v. Mack*, 45 F.3d 185, 186 (7th Cir. 1995). "We make an exception for any criminal case in which [Dix] is a defendant and for any application for habeas corpus that he may wish to file. That is, we will not impede him from making any filings necessary to protect him from imprisonment or other confinement, but we will not let him file any paper in any other suit in the federal courts of this circuit … ." *Id.*

We spare Dix from financial penalties today, but we once again warn him that *pro se* litigants are not excused from the monetary sanctions available under Federal Rule of Civil Procedure 11 and Federal Rule of Appellate Procedure 38. *See Vukadinovich v. McCarthy*, 901 F.2d 1439, 1445 (7th Cir. 1990); *Reis v. Morrison*, 807 F.2d 112, 113 (7th Cir. 1986). We urge our constituent courts to take notice that they may, and should,

greet any attempt by Dix to file papers in contravention of this opinion with financial sanctions.[9]

One last remark. We sometimes enlist *amici curiae* in difficult and thankless tasks. We extend our utmost gratitude to the *amicus* recruited here for assuming this burden, properly distilling the facts in this case, and presenting a fine legal argument worthy of being considered by this court.

## III. CONCLUSION

The judgment of the district court is AFFIRMED. The clerks of the federal courts of this circuit are hereby ORDERED to return unfiled any papers submitted to these courts either directly or indirectly (as by mail to individual judges) by or on behalf of Gerald Dix, with the exceptions noted in the opinion.

---

[9] As the district court mentioned, it is also evident from Dix's amended complaint that he routinely engages in the unauthorized practice of law (because he feels "it is common for licensed attorneys to commit fraud on the courts"). For example, he alleges that he wrote "a Petition for Rehearing to the Second District of the Illinois Appellate Court on behalf of his brother" (though it fell short of "address[ing] every legal issue to protect that plaintiff"); he has "often been called upon to commence and maintain legal action on behalf of … others against malefactors"; and he even repeatedly refers to his "billable hours" for performing such "consulting"—i.e., legal—work. We, too, note this for the benefit of state authorities. *See* 705 Ill. Comp. Stat. 205/1.